UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

EDWARD STEPHONE WILLIAMS,

        Debtor.

_____/

STUART A. GOLD, TRUSTEE,

        Plaintiff,

vs.

CAMILE VANCE WILLIAMS,[1] GREGORY
STEPHONE WILLIAMS and CAMRON
LASHAWN WILLIAMS,

        Defendants.

_____/

Case No. 20-51655

Chapter 7

Judge Thomas J. Tucker

Adv. Pro. No. 21-4032

**OPINION REGARDING (1) DEFENDANTS' MOTION FOR RELIEF FROM
JUDGMENT; AND (2) DEFENDANTS' MOTION FOR RELIEF FROM THE
AUTOMATIC STAY AND TO HOLD PROCEEDINGS IN ABEYANCE**

## I. Introduction

      The dispute in this case centers around an unrecorded deed to real estate that the Court

now finds to be a forgery. The Plaintiff Chapter 7 Trustee obtained a default judgment against

the three Defendants, determining that the real estate at issue is property of the bankruptcy estate.

Almost six months later, the Defendants moved for relief from the judgment. The Court will

deny such relief.

      In this adversary proceeding, the Chapter 7 Trustee sued the three adult children of the

_____

[1] The name of the Defendant "Camile Vance Williams" in the caption appears to be a
typographical error. At her deposition this Defendant stated that her name was "Camile Vanice
Williams" and this name appears on documents that are in the record in this adversary proceeding.

Chapter 7 Debtor, seeking a determination that the bankruptcy estate owns the real property in which the Debtor and the adult children live, located at 18405 Prairie St., Detroit, Michigan 48221 (the "Property").  The complaint alleged that when the Debtor, Edward Stephone Williams, filed his bankruptcy petition, the Property was owned by the Debtor.  As a result, the complaint alleged, the bankruptcy estate now owns the Property, and the Trustee may sell it for the benefit of the estate and its creditors.

The Trustee's legal theory in the complaint was that the Debtor inherited the Property from his wife, Celia Williams, who was the sole owner of the Property until she died on June 15, 2019.  She died without a will, and the Trustee alleged that under Michigan's intestacy statute, the Debtor became the sole owner of the Property.

None of the Defendants responded to the Trustee's complaint, and the Court entered a default judgment against them on February 26, 2021, granting the Trustee full relief, including a determination that the Property is property of the bankruptcy estate.

Then, one of the Defendants, Camile Williams, made a written agreement with the Trustee on April 10, 2021, to purchase the Property from the bankruptcy estate.  Ultimately, the agreed price was $75,000.00.  The purchase agreement signed by Camile Williams, and three later addenda to the purchase agreement signed by Camile Williams, all clearly stated that the Property was owned by the bankruptcy estate.

Over a period of four months, Camile Williams paid the Trustee a total of $10,000.00 in deposits toward the purchase of the Property.  After the Trustee settled the objections of two creditors to the sale, the Court granted the Trustee's motion for authority to sell the Property.

But Camile Williams did not close the sale.  Instead, she and the other Defendants filed a

motion seeking relief from the default judgment. The motion was filed on August 11, 2021. That was almost six months after the default judgment was entered, and four months after the Defendant Camile Williams signed the purchase agreement with the Trustee.

The Defendants' motion alleges, primarily, (1) that none of the three Defendants actually received the summons and complaint that the Trustee served on each of them by first class mail; and (2) that the Defendants' mother, Celia Williams, transferred the Property to the Defendants three months before she died, by means of an unrecorded quit claim deed. Based on this, the Defendants argue that they, rather than the Debtor, owned the Property when the Debtor filed bankruptcy. As a result, the Defendants allege, they jointly own the Property, and the bankruptcy estate does not.

The Trustee disputes all of these allegations. The Trustee contends that the Defendants did receive the summons and complaint, and that the unrecorded deed on which the Defendants rely is a fake. The Trustee contends that the deed was not signed by Celia Williams before she died, but rather that her alleged signature on the deed was forged by someone else, well after Celia Williams's death.

The Court held an evidentiary hearing. Based on the evidence presented, and for the reasons stated in this Opinion, the Court finds that all three Defendants were timely served with and actually received the summons and complaint, and that the deed on which the Defendants rely is indeed a fake. And the Court rejects the Defendants' other arguments. The bankruptcy estate is the sole owner of the Property, and the default judgment will stand.

## II. Brief procedural history

This adversary proceeding is before the Court on two Motions filed by the Defendants,

entitled: (1) "Motion for Relief From Judgment" (the "Rule 60(b) Motion");[2] and (2) "Motion for Relief from the Automatic Stay and to Hold Proceedings in Abeyance" (the "Stay-Relief Motion")[3] (collectively, the "Motions").

After allowing the parties to conduct discovery, the Court held an evidentiary hearing on the Rule 60(b) Motion.[4] At the same time, the Court held a hearing on the Stay-Relief Motion.

The Court has considered all of the evidence and all of the written and oral arguments presented by the parties. This includes the testimony of all the witnesses — namely, each of the three Defendants: Camile Williams; Camron Williams, and Gregory Williams; the Debtor, Edward Stephone Williams; the notary public, Kimberly Coleman, and the Chapter 7 Trustee, Stuart Gold.[5] The Court also has considered all of the exhibits that were admitted into evidence during the evidentiary hearing.[6]

This Opinion states the Court's findings of fact and conclusions of law. For the reasons stated in this Opinion, the Court will deny both of the Defendants' Motions.

## III. Facts

---

[2] Docket # 13.

[3] Docket # 54.

[4] Due to the COVID pandemic, the evidentiary hearing was conducted remotely, rather than in person in the courtroom. This was done by a combination of Webex video conference and telephone.

[5] A transcript of the testimony of all of these witnesses has been filed, at Docket # 68, and will be cited in this Opinion using the format: "Tr. __."

[6] In this Opinion, the Court will cite the evidentiary hearing exhibits using this format: "PX-__" for the Plaintiff Trustee's exhibits; and "DX-__" for the Defendants' exhibits. The Plaintiff's exhibits admitted into evidence are PX-1 through PX-16, and PX-20, 22, and 25-37. All of these Plaintiff's exhibits are filed at Docket # 51. The Defendants' exhibits admitted into evidence are DX-A through DX-L, except DX-C. DX-C was admitted for only a limited purpose, as the Court stated on the record at Tr. 13-14, 173-75. The Defendants' exhibits are filed at Docket # 53.

4

## A. Background

Pre-petition, in November 2011, the Debtor's wife, Celia Ann Williams, purchased the Property,[7] and it is undisputed that she was the sole owner of the Property until at least March 14, 2019. On June 15, 2019, Celia Williams died, leaving the Debtor as her surviving spouse.[8] She left no will, and no probate estate was ever opened regarding Celia Williams.[9] Seventeen months after his wife's death, on November 17, 2020, the Debtor Edward Stephone Williams filed a voluntary Chapter 7 petition, commencing Case No. 20-51655.

## B. The default judgment entered against the Defendants in this adversary proceeding

On January 25, 2021, the Trustee filed this adversary proceeding, by filing a two-count complaint against the Defendants, Camile Williams ("Camile"), Gregory Williams ("Gregory"), and Camron Williams ("Camron") (the "Complaint").[10] The Defendants are the three adult children of the Debtor. They have all resided at the Property with the Debtor for the past 12 years.[11] The Complaint sought "entry of a judgment declaring that [(1)] the bankruptcy estate is the owner of the Property pursuant to 11 U.S.C. § 541(a)(1) that [the] Plaintiff may use, sell or lease under 11 U.S.C. § 363(b)(1)" (Count I); and (2) "the bankruptcy estate . . . [is] the owner of

---

[7] *See* DX-F; Tr. 98-100 (testimony of Kimberly Coleman).

[8] *See, e.g.*, PX-20 at pdf p.7 ("Certificate of Death").

[9] *See* Tr. 139-40 (testimony of Camron Williams); Tr. 161-62 (testimony of Gregory Williams); Tr. 187 (testimony of Edward Williams); Tr. 205 (testimony of Stuart Gold).

[10] Docket # 1.

[11] *See* Tr. 5-6 (testimony of Camile Williams); Tr. 131-32 (testimony of Camron Williams); Tr. 156 (testimony of Gregory Williams).

5

the Property free and clear of any interest of the [D]efendants" (Count II).[12]

The Complaint alleged that "[f]ollowing Celia Ann Williams' death[,] the [D]ebtor inherited an interest in the Property by intestate succession and continued to reside in the Property as the surviving spouse."[13]  The Complaint alleged further that "[a]s a result of his spouse's death the [D]ebtor inherited an interest in the Property in order to satisfy [the D]ebtor's right to the first $150,000, plus ½ of any balance of his spouse's intestate estate.  *See* Mich. Comp. Laws § 700.2102(1)(b)."[14]

Alternatively, the Complaint stated, that "[i]n the event that the [D]efendants claim that they own the Property as a result of some prior conveyance, then the Trustee asserts that any such interest may be avoided as unperfected."[15]  The Complaint alleges that the "Defendants' interest in the Property, if any, must be avoided and recovered under 11 U.S.C. §§ 544(a)(1), 544(a)(3) and 550(a), and preserved for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551."[16]

A summons entitled "Summons In An Adversary Proceeding" (the "Summons") was issued on January 25, 2021, and the Trustee served it on that date, along with a copy of the Complaint, by first class mail to each of the Defendants at the address of the Property,[17] where, as noted above, they have all resided for the past 12 years.  At that time, the Debtor was represented

---

[12]  Compl. at 3 ("WHEREFORE" clause), 5 ("WHEREFORE" clause).

[13]  *Id.* at 3 ¶ 11.

[14]  *Id.*

[15]  *Id.* at 4 ¶ 17.

[16]  *Id.* at 5 ¶ 21.

[17]  PX-2; *see also* Docket ## 2, 3; DX-A, B.

6

by an attorney in his bankruptcy case, and his attorney received immediate electronic notice of the Summons and Complaint, by e-mail through the Court's ECF system. The Debtor was represented by an attorney until March 23, 2021, when he fired her.[18] The Debtor alleges that his attorney never informed him about the Complaint.[19]

The Summons stated, in relevant part:

> **YOU ARE SUMMONED** and required to submit a motion or answer to complaint which is attached to this [S]ummons to the Clerk of the Bankruptcy Court within 30 days from the date of issuance of this [S]ummons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days of issuance.
> . . . .
>
> **IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.[20]**

None of the mail containing the Summons and Complaint addressed to the Defendants was returned as undeliverable or otherwise. None of the Defendants filed an answer or other response to the Complaint.

On February 25, 2021, the Clerk entered a default against all of the Defendants for their failure "to timely plead or otherwise defend in said proceeding as directed in said [S]ummons

---

[18] *See* PX-5 (email from the Debtor to his attorney firing her).

[19] *See* Tr. 192 (testimony of Edward Williams).

[20] PX-2, Docket # 2 (bold and capitalization in original).

7

and as provided in the Federal Rules of Bankruptcy Procedure."[21]

On February 26, 2021, the Trustee filed an application for the entry of a default judgment against the Defendants (the "Application").[22]  In support of the Application, the Chapter 7 Trustee filed an affidavit stating, in relevant part, that "[o]n January 25, 2021, the Complaint and Summons . . . were served on the [D]efendants by first class mail delivery to [the D]efendants."[23]

On the same day, the Court granted the Trustee's Application, and entered a default judgment against all of the Defendants on the Complaint (the "Default Judgment"), "due to [the] Defendants' failure to timely answer [the] Plaintiff's Complaint, and following the Clerk's Entry of Default against all [the] Defendants[.]"[24]  The Default Judgment stated, in relevant part:

> IT IS ORDERED that a default judgment is entered in favor of Plaintiff and against all of the Defendants, on both Counts of Plaintiff's Complaint (Docket # 1, Counts I and II).
>
> IT IS FURTHER ORDERED that Defendants' interest, if any, in real property located at 18405 Prairie St., Detroit, Michigan 48221 is avoided and recovered by the bankruptcy estate under 11 U.S.C. §§ 544(a)(1), 544(a)(3), and 550(a).
>
> IT IS FURTHER ORDERED that the real property commonly known as 18405 Prairie, Detroit, Michigan, County of Wayne, State of Michigan, legally described as:
>
> Lot(s) 622 of Canterbury Gardens No. 1 as recorded in Liber 37 of Plats, Page(s) 66, Wayne County Records
>
> Tax Parcel ID No. 16023179

---

[21]  Docket # 4 ("Default Entry by Clerk").

[22]  Docket # 5.

[23]  Ex. 5 to Docket # 5 at pdf p. 7 ¶ 5.

[24]  Docket # 6.

("the Property") is owned solely by the bankruptcy estate of *Edward Stephone Williams* Case No. 20-51655-TJT (Bankr. E.D. Mich. 2020), free and clear of any interest of the Defendants.

IT IS FURTHER ORDERED that a copy of this Judgment may be recorded with all state and federal governmental agencies, including the Wayne County Register of Deeds, as conclusive evidence of the bankruptcy estate's exclusive ownership of the Property.[25]

On the same day the February 26, 2021 Default Judgment was entered, the Clerk of this Court mailed to each of the Defendants a copy of the Default Judgment, at the Property address,[26] and this adversary proceeding was closed. None of these mailings of the Default Judgment addressed to the Defendants was returned to the Clerk's office as undeliverable or otherwise.

At the time the Default Judgment was entered, the Debtor was still represented by an attorney in his bankruptcy case. Notice of the entry of the Default Judgment was e-mailed to the Debtor's attorney twice, by the Court's ECF system, on February 26, 2021.[27]

## C. The Trustee's March 10, 2021 Letter to the Debtor and each of the Defendants

On March 10, 2021, counsel for the Trustee mailed a letter to the Debtor and each of the Defendants, at the Property address, with a copy to the Debtor's bankruptcy attorney, to remind them that the bankruptcy estate owned the Property and owned the right to receive rent for the Property. The letter demanded that the Debtor and the Defendants "pay, beginning on December 1, 2020 and each month thereafter, rent of $1,500.00 per month payable to 'Stuart Gold Chapter

---

[25] *Id.*

[26] *See* Clerk's Certificate of Mailing, filed February 26, 2021.

[27] This occurred by the February 26, 2021 entry on both the docket of this adversary proceeding and the docket of the Debtor's bankruptcy case, of the following notation: "Disposition of Adversary 2:21-ap-4032: Granted by Default Judgment."

9

7 Trustee of Williams'" (the "March 10, 2021 Letter").[28]  The March 10, 2021 Letter further

stated:

> Please let me know if you would like to purchase the [P]roperty
> from the bankruptcy estate free and clear of liens.  Unless we
> receive immediate notice of an interest from any of you to buy the
> [P]roperty, the Trustee will hire a broker to market the [P]roperty
> for sale.
>
> If you have any questions or comments, please do not hesitate to
> call me or email me . . . .[29]

## D.  The Purchase Agreement for the Property entered into by the Chapter 7 Trustee and Camile

On April 10, 2021, the Trustee entered into a purchase agreement with the Defendant

Camile (the "Purchase Agreement").[30]  The Purchase Agreement, which Camile admits she

signed,[31] clearly stated in the first two paragraphs that the Trustee owned the Property.  In its very

first paragraph, the agreement defined the "Buyer" as "Camile Vanice Williams, a single woman

('Buyer')" and the Trustee, as Trustee of the bankruptcy estate of Edward Stephone Williams as

the 'Seller."  Then in the next paragraph, the agreement stated that the Trustee owned the

Property: "WHEREAS, **Seller owns residential [P]roperty located at 18405 Prairie St.,**

**Detroit, Michigan 48221**.  Buyer is a current occupant of the [P]roperty located at 18405 Prairie

St., Detroit, Michigan 48221."[32]

---

[28]  PX-4.

[29]  *Id.*

[30]  PX-6.

[31]  Tr. 36 (testimony of Camile Williams).

[32]  PX-6 at 1 (emphasis added).

10

Camile not only admitted that she signed this agreement, but also testified that she read this agreement and reviewed it with her father, the Debtor, before she signed it.[33]

The Purchase Agreement provided that Camile would purchase of the Property for $50,000.00, and it required a $5,000.00 deposit, which Camile paid to the Trustee.[34] The Purchase Agreement provided that the closing on the Property would occur "in no circumstances later than May 31, 2001."[35]

**E. The Trustee's sale motion, which was served on Camile**

On April 12, 2021, the Trustee filed a motion in the Debtor's bankruptcy case, seeking "authority to consummate the [P]urchase [A]greement, to sell the Property free and clear of notices of federal tax liens and to pay a reduced broker's commission" (the "Sale Motion").[36] The Trustee's counsel served a copy of the Sale Motion, including a copy of the Purchase Agreement, on Camile by first class mail on April 12, 2021.[37]

Two objections to the Sale Motion were filed. First, on April 28, 2021, the Wayne County Treasurer (the "WCT") filed an objection to the Sale Motion (the "WCT Objection").[38] In the WCT Objection, the WCT stated that there were unpaid property taxes in the amount of

---

[33] Tr. 36 (testimony of Camile Williams).

[34] PX-6 at 2 ¶¶ 3, 3.a; Tr. 37 (testimony of Camile).

[35] *Id.* at 3 ¶ 8.a.

[36] PX-8 at 6; *see also* Docket # 24 in Case No. 20-51655 at 6.

[37] *See* PX-6 at pdf pp. 12-13.

[38] Docket # 27 in Case No. 20-51655.

11

$585.00 owing on the Property for 2020, and that it held a first priority lien on the Property.[39]

The WCT Objection requested that the Court "deny the Sale Motion or alternatively, order

payment of the [WCT's] liens from sale proceeds upon closing."[40]

After the Trustee's counsel informed Camile and the Debtor about the WCT Objection

regarding the unpaid taxes, in e-mails dated April 29, May 5, 2021, and May 17, 2021,[41] the

Debtor paid the taxes.[42]

The second objection to the Sale Motion was filed on May 3, 2021, by the United States,

on behalf of the Internal Revenue Service (the "IRS") (the "IRS Objection").[43]  The IRS

Objection stated that it had two tax liens on the Property, based on the Debtor's failure to pay

federal income taxes for the tax years 2003 through 2012:

> 2.   Upon information and belief, Debtor's wife, Celia Ann
> Williams, died June 15, 2019, and Debtor inherited an interest in
> the Property by intestate succession as a surviving spouse.
>
> 3.   Debtor's interest in the Property was, upon acquisition,
> and presently is, subject to two federal tax liens for unpaid federal
> income taxes. The IRS recorded a Notice of Federal Tax Lien in
> Wayne County on November 13, 2013, for Debtor's federal tax
> liabilities for tax years 2003 through 2011. The IRS then recorded
> a second Notice of Federal Tax Lien in Wayne County on
> December 18, 2015, for Debtor's federal tax liabilities related to

---

[39]   *See id.* at 2 ¶¶ 5-10.

[40]   *Id.* at 3.

[41]   PX-9 at pdf pp. 1, 3 (e-mails dated April 29, 2021, May 5, 2021, and May 17, 2021).

[42]   Tr. 43 (testimony of Camile); PX-36 (transcript of Edward Williams deposition) at 61.
Although Camile testified that her father paid these taxes, she also testified that she helped fund the tax
payment.  (Tr. 43 (testimony of Camile)).  But her father, the Debtor, testified that he paid these taxes
with his own funds.  (PX-36 (Edward Williams Dep. Tr.) at 61).

[43]   Docket # 30 in Case No. 20-51655.

tax year 2012. *See* Claim 2-1. The federal tax liens attached to "all [of the taxpayer's] property and rights to property," whether such property is real or personal property. 26 U.S.C. § 6321. *See also United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 719-20, 105 S. Ct. 2919, 86 L. Ed. 2d 565 (1985).

4. The IRS's claim in this case consists of a secured claim in the amount of $196,322.08, a priority claim in the amount of $91,939.17, and a general unsecured claim in the amount of $53,042.90.[44]

The IRS Objection expressed concern that the proposed $50,000.00 sale price of the Property under the Purchase Agreement was unreasonably low, especially given the fact that the sale was to an insider.[45]

On May 6, 2021, counsel for the Trustee e-mailed Camile to inform her about the IRS Objection and to ask whether she wanted to increase the purchase price for the Property from $50,000.00 to $75,000.00, in order to resolve the IRS Objection:

Camile,
. . . .

The United States, and its agency the IRS, filed this attached objection to the [S]ale [M]otion. They assert that based upon comparable sales of property in the immediate area the [P]roperty is worth substantially more than the negotiated price. As the largest creditor in the case they can veto the sale. I have also attached a copy of the IRS's claim. However, the attorney representing the government has advised the Trustee that the government will withdraw the [IRS O]bjection to the sale if the sales price is increased to $75,000.00.

Let me know what you want to do. We can refund the deposit to you and test the market or you can agree to amend the [P]urchase

---

[44] *Id.* at 2 ¶¶ 2-4.

[45] *Id.* at 3-4 ¶¶ 8-13.

13

[A]greement to $75,000.[46]

## F. The first addendum to the Purchase Agreement

Camile agreed to increase the purchase price for the Property. On May 14, 2021, the Chapter 7 Trustee and Camile executed an "Addendum to April 10, 2021 Purchase Agreement for Sale of Real Property" (the "First Addendum").[47] In addition to agreeing to the increased purchase price of $75,000.00, Camile agreed to close the sale on or before June 30, 2021. In this one-page First Addendum, which Camile admits she signed,[48] Camile also agreed, as she had done previously in the Purchase Agreement, that the Trustee "owns" the Property.[49]

## G. The Court's Order approving the sale of the Property

On May 17, 2021, the Chapter 7 Trustee filed a stipulation between himself, the WCT and the IRS, in which the parties agreed to the entry of an attached proposed order authorizing the sale of the Property (the "Proposed Sale Order").[50] On the same day, the Court entered an order granting the Sale Motion, and authorizing the sale of the Property to Defendant "Camile Vanice Williams and/or her assignees for $75,000 free and clear of Notices of Federal Tax Liens filed against Edward Williams under 11 U.S.C. §§ 363(b) and 363(f) (the "Sale Order").[51] The Sale Order stated, in part:

---

[46] *See* PX-9 at pdf p. 2.

[47] PX-10 at pdf p. 2.

[48] Tr. 44 (testimony of Camile).

[49] *See* PX-10 at pdf p. 2.

[50] Docket ## 37, 37-1 in Case No. 20-51655.

[51] *See* PX-11 ("Order Authorizing Sale of Property Free And Clear of Tax Liens and Payment of Commissions") at ¶¶ 1-2; *see also* Docket # 38 in Case No. 20-51655 at ¶¶ 1-2.

14

> This Order may be recorded or filed with the Wayne County
> Register of Deeds to evidence **the fact that the Property was
> owned by the bankruptcy estate, sold to Camile Vanice
> Williams,** and that any and all state and federal income tax liens
> with respect to the Property have been discharged and released.[52]

On May 17, 2021, counsel for the Trustee e-mailed to Camile and to the Debtor copies of the fully executed First Addendum and the Sale Order.[53] That e-mail stated, in relevant part: "It is important we close on the sale as soon as possible. Let me know when you are getting close to having the funds ready as we will then get you a certified copy of the [S]ale [O]rder for recordation."[54] But as discussed below, the Trustee's sale of the Property to Camile never closed.

**H. The "Affidavit of Deed" filed by the Debtor with the Wayne County Register of Deeds.**

On June 15, 2021, with Camile's knowledge but unbeknownst to the Trustee or the Trustee's attorney, the Debtor filed a document entitled "Affidavit of Deed" with the Wayne County Register of Deeds.[55] The Affidavit of Deed stated:

> This declaration is in connection with the deed executed on the
> 14th day of March, 2019 by and between:
>
> Celia Williams
> (Grantor(s)) and
> Camile Vanice Williams, Gregory Stephone Williams, Camron
> La[S]hawn Williams
> (Grantee(s)) regarding the real [P]roperty located at
> 18405 Prairie, Detroit Michigan 48221
> legally described as:

---

[52] *Id.* at ¶ 7 (emphasis added).

[53] *See* PX-9 at pdf p. 1.

[54] *Id.*

[55] *See* DX-C; Tr. 201 (testimony of Edward Williams); Tr. 45, 47, 50, 53 (testimony of Camile).

Lot 662,[56] Canterbury Garden Subdivision No. 1, according to the
plat thereof in Liber 37, Page 66 of Plats,
Wayne County Records

**A copy of the executed subject deed is attached for reference.**

The undersigned Grantee(s) declares as follows:

1.  That the subject deed was delivered to the Grantee(s) or their
authorized representative.

2.  That the Grantee(s) accepted the subject deed voluntarily and
did not act under coercion or duress

This declaration is made for the protection of the Grantee(s) and
their successors.  The undersigned Affiant(s) will testify as to the
truth of the facts set forth hereinabove in the event an action is
instituted disputing these facts.[57]

The Affidavit of Deed was signed by each of the three Defendants on June 14, 2021.

Attached to the Affidavit of Deed was a copy of what the Defendants say is a quit claim

deed that was signed on March 14, 2019 by Celia Williams.[58]  The deed is titled "Quit Claim

Deed," and purportedly was signed by Celia Williams just over three months before she died (the

"Quit Claim Deed").  The Quit Claim Deed purports to "quit claim" the Property to the

Defendants (Camile, Gregory, and Camron), "as joint tenants with full rights of survivorship."[59]

The Quit Claim Deed purports to bear the notarized acknowledgement by Celia Williams that she

executed the document.  The acknowledgement is dated March 14, 2019, and purportedly was

---

[56] This is an incorrect legal description.  The Lot number in the attached purported quit claim
deed was "622" not "662" as it appears in the Affidavit of Deed.

[57] DX-C at pdf p. 2 (footnote added) (bold added).

[58] *Id*. at pdf p. 3.

[59] *Id.*

16

notarized by Kimberly Coleman, notary public.[60]

It is undisputed that the Quit Claim Deed was never recorded, except as an attachment to the Affidavit of Deed recorded on June 15, 2021, which was 19 months after the Debtor filed his bankruptcy petition.

Neither the Debtor nor Camile, nor anyone else, informed the Trustee or his counsel of this filing of the Affidavit of Deed. Instead, the Debtor and Camile sought more extensions of time to close on the Purchase Agreement, without mentioning the filing of the Affidavit of Deed at the Wayne County Register of Deeds.[61] The Defendants did not disclose this filing to the Trustee until October 20, 2021,[62] more than four months after it was filed.

**I. Camile and the Trustee execute two more addenda to the Purchase Agreement**.

On June 18, 2021, three days after the Debtor secretly recorded the Affidavit of Deed, Camile signed a document entitled "Second Addendum to April 10, 2021 Purchase Agreement for Sale of Real Property" (the "Second Addendum").[63] The Second Addendum stated, in relevant part: that **"Seller owns . . . the Property;"** that "Buyer agrees to close the sale [of the

---

[60] *See id.*

[61] *See, e.g.*, PX-12 (June 15, 2021 e-mail from counsel for the Trustee to Camile with a copy to the Debtor referencing the Debtor's "request for an extension of time for you to close the sale"); PX-14 (July 12, 2021 e-mail from the Debtor to counsel for the Chapter 7 Trustee) ("I am sending this email in reference to my earlier request on June 8, 2021 for an [ ] extension of August 31, 2021. I again am asking that the signing date be extended to August 31, 2021."); PX-16 at pdf p. 2 (email dated June 15, 2021 to Camile with a copy to the Debtor from counsel for the Trustee regarding the Debtor's "request for an extension of time for you to close the sale").

[62] *See* Tr. 58-61 (testimony of Camile), 61 at lines 14-20 (no evidence that the Affidavit of Deed was ever produced to Trustee's counsel by Defendants until defense counsel produced it by e-mail on October 20, 2021).

[63] PX-13; Tr. 46 (testimony of Camile).

Property] on or before July 31, 2021;" and that "Buyer shall deliver an additional $2,000 to Seller

by money order on or before June 21, 2021 in order to cause this [S]econd [A]ddendum to

become effective."[64]  Camile testified that the Defendants and the Debtor together decided to

request this extension of the closing deadline, and funded the extra $2,000.00 deposit required.[65]

On July 21, 2021, Camile signed a document entitled "Third Addendum to April 10, 2021

Purchase Agreement for the Sale of Real Property" (the "Third Addendum").[66]  The Third

Addendum provided, in relevant part:

> The parties agree to the following recitals and amendment to the
> April 10, 2021 Purchase Agreement for the Sale of Real Property.
>
> WHEREAS, **Seller owns . . . the Property. . .**
>
> WHEREAS, on May 17, 2021, the . . . Court entered . . .
> [the Sale Order] which approved the sale of the Property to Buyer
> for the sale price of $75,000.00.
>
> WHEREAS, . . . [p]ursuant to the prior June 18, 2021
> Second Addendum to [the] . . . Purchase Agreement . . . Buyer is
> required to close the sale on or before July 31, 2021.  Buyer
> requests and additional extension of time to close the sale through
> the end of August 31, 2021.
>
> NOW THEREFORE, . . .
>
> a.  Buyer agrees to increase the existing non-refundable
> earnest money deposit of $7,000.00 provided for in paragraph 3.a.
> of the April 10, 2021 Purchase Agreement . . . and the June 18,
> 2021 Second Addendum to $10,000.00.  Buyer shall deliver an

---

[64]  PX-13 at 1 (emphasis added).

[65]  *See* Tr. 45 (testimony of Camile) (regarding the Debtor's request to the Trustee for the closing
extension to July 31, 2021, "[w]e all sat down and agreed to it"); 46 (regarding funding the "extra earnest
money deposit of $2,000 to [the Trustee]," "[w]e did this together.")

[66]  PX-15; Tr. 49 (testimony of Camile).

18

additional $3,000.00 to Seller by money order on or before July 21, 2021 in order to cause this [T]hird [A]ddendum to become effective.

b. Buyer agrees to close the sale on or before August 31, 2021 at the offices of Gold, Lange, Majoros & Smalarz, P.C. In the event Buyer fails or refuses to close on or before August 31, 2021, then Seller shall retain the entire earnest money deposit as liquidated damages and in satisfaction of any claim by Seller against Buyer for unpaid rent for Buyer's use and occupancy of the Property through August 31, 2021.[67]

The additional $3,000.00 deposit was paid as required by the Third Addendum; Camile testified that the three Defendants and the Debtor "all funded it together."[68]

At no time during the negotiations for the sale of the Property, the execution of the Purchase Agreement, and the execution of the three addenda to the Purchase Agreement, did Camile ever communicate to counsel for the Trustee that she believed that she owned the Property or that she had a Quit Claim Deed, which purported to transfer the Property from her mother, Celia Williams, to her three children, Camile, Gregory, and Camron.[69]

Camile did not close on the Property by the August 31, 2021 deadline in the Third Addendum. Instead, along with the two other Defendants, Camile filed a motion on August 10, 2021, asking to reopen the adversary proceeding in order to seek relief from the Default

---

[67] PX-15 at 1-2 (emphasis added).

[68] Tr. 49 (testimony of Camile).

[69] *See* PX-35 (Dep. Tr. of Camile) at 55:

Q. [By counsel for the Chapter 7 Trustee]: It's true, you never once called me up, sent me an e-mail, or wrote me a letter claiming you already were the owner of the [P]roperty; isn't that true?

A. [By Camile]: I didn't think I - - yes, its true.

19

Judgment.[70]

## J. The Defendants' Rule 60(b) Motion

On August 11, 2021, after the Court entered an order granting the Defendants' motion reopening this adversary proceeding, the Defendants filed the Rule 60(b) Motion.[71] That motion seeks relief from the Default Judgment entered against the Defendants, with regard to Count I of the Complaint, based on Fed. R. Civ. P. 60(b)(1) on the ground of mistake. According to the Defendants, the mistake in the Default Judgment is the conclusion that the Debtor inherited the Property upon the death of his wife. The Defendants allege that on March 14, 2019, before her death on June 15, 2019, their mother transferred the Property to them by a quit claim deed that was delivered to them on that date.[72] The Rule 60(b) Motion reasons, in relevant part:

> 12. Because the Debtor's wife no longer owned the [P]roperty at the time of her death, the [P]roperty would not have been property of her decedent/probate estate.
>
> 13. Because the [P]roperty would have not been part of his wife's decedent/probate estate, the Debtor would not have inherited it.
>
> 14. Because the Debtor would have not inherited the [P]roperty, the [P]roperty would not have been a part of the Debtor's bankruptcy estate pursuant to 11 U.S.C. [§] 541(a).
>
> 15. The argument the Chapter 7 Trustee made in his [C]omplaint that the Debtor acquired an interest in the [P]roperty as the result of inheritance is clearly erroneous.
>
> 16. The Chapter 7 Trustee's erroneous argument led to the entry

---

[70] Docket # 11.

[71] Docket # 13.

[72] *Id.* at ¶¶ 7-8, 11.

of a fundamentally incorrect [D]efault [J]udgment which
clearly overlooked controlling statutory and case law.[73]

The Defendants attached to the Rule 60(b) Motion, a copy of the purported Quit Claim

Deed allegedly signed by their mother before her death.[74]

The Rule 60(b) Motion also seeks relief from the Default Judgment on Count II of the

Complaint, under Fed. R. Civ. P. 60(b)(1) on the ground of mistake. The mistake is the same as

for Count I. The Defendants allege that "[t]he [P]roperty was never owned by the Debtor" and

that therefore "[t]he [P]roperty was . . . never 'property of the [D]ebtor', as contemplated by 11

U.S.C. [§] 544."[75] For these reasons, the Rule 60(b) Motion alleges that "[t]he Chapter 7 Trustee

. . . . had no grounds to avoid any transfer of the [P]roperty pursuant to 11 U.S.C. [§] 544" and

"[t]he Chapter 7 Trustee's erroneous argument led to the entry of a fundamentally incorrect

[Default J]udgment which clearly overlooked controlling statutory and case law."[76]

The Rule 60(b) Motion also seeks relief under Fed. R. Civ. P. 60(b)(6), on due process

grounds. The Defendants allege that they "never received the [C]omplaint," and that they "were

not aware of the [C]omplaint or the [D]efault [J]udgment until they met with their attorney on

July 27, 2021."[77] The Defendants attached to the motion affidavits of each one of them, dated

August 8, 2021, stating:

> l.   I have reviewed the Complaint that was filed on January 25,

---

[73]   *Id.* at ¶¶ 12-16.

[74]   *Id.* at pdf p. 9.

[75]   *Id.* at ¶¶ 26-27.

[76]   *Id.* at ¶¶ 28-29.

[77]   *Id.* at ¶¶ 37, 40-41.

2021, in this adversary proceeding.

2. I have reviewed the Certification of Service which was filed on January 25, 2021, in this proceeding.

3. I did not receive the Complaint in the mail.

4. I only became aware of the Complaint when my attorney told me about it recently.[78]

The Rule 60(b) Motion alleges that "[t]he Defendants' failure to respond to the [C]omplaint was beyond their control and is an extraordinary circumstance."[79]

Later, on October 13, 2021, on an unopposed motion filed by the Defendants, the Court entered an order construing the Rule 60(b) Motion to include Fed. R. Civ. P. 60(b)(4).[80] Therefore, the Rule 60(b) Motion now includes the Defendants' argument that under Rule 60(b)(4), the Default Judgment is "void," because "[t]he failure to properly serve the Defendants resulted in the Court not having personal jurisdiction over the Defendants."[81]

## K. The Trustee's response to the Defendants' Rule 60(b) Motion

In his response to the Rule 60(b) Motion, the Trustee argued that "the Defendants have failed to demonstrate that grounds exist under Fed. R. Civ. P. 60(b)(6) or 60(b)(1) to set aside the Default Judgment" (the "Response").[82] The Trustee argued that the three identical affidavits filed by the Defendants are "sham affidavits," and fail to establish that the Defendants did not receive

---

[78] *Id.* at pdf pp. 10-12; *see also* PX-1.

[79] Docket # 13 at ¶ 43.

[80] Docket ## 22, 32.

[81] *See* Docket # 22 at ¶¶ 7-9.

[82] Docket ## 14, 16.

proper service of the Summons, the Complaint, and the Default Judgment. The Trustee contends that the Defendants were properly served with, and received, all of these documents, citing "the [Trustee's] contemporaneous affidavit of service on all three (3) [D]efendants by separate mail, the [D]efendants' father's notice of the filing of the [C]omplaint, and the [D]efendant's [(Camile's)] subsequent purchase of the Property from the bankruptcy estate").[83]

The Trustee further argued that "the culpable conduct of the Defendants led to the [entry of the] Default [Judgment]," and for this reason alone, the Rule 60(b) Motion should be denied.[84] The Trustee also argued that he would be prejudiced if the Default Judgment was vacated, "because the Trustee and bankruptcy estate have incurred significant time and expense associated with obtaining the [Default J]udgment and administering the Property."[85]

And the Trustee argued that "[t]he Defendants have no meritorious defense," having failed to demonstrate the authenticity of the copy of the Quit Claim Deed they provided; to set forth facts demonstrating that the Defendants' mother delivered the Quit Claim Deed to the Defendants with the intent to transfer the Property to them; and to explain why the [Quit Claim D]eed was unrecorded, why the Defendants are unable to produce an original Quit Claim Deed, and why "the [D]ebtor, not the [D]efendants took actions consistent with the [D]ebtor's

---

[83] Pl.'s Mem. of Law in Supp. of Pl.'s Resp. And Obj. To Defs.' Mot. to Set Aside Default J. (Docket # 16) at 10; *see also* Docket # 14 at 3 ¶ 1 ("The [S]ummons and [C]omplaint were properly served upon each [D]efendant at the correct address.").

[84] Pl.'s Mem. of Law in Supp. of Pl.'s Resp. And Obj. To Defs.' Mot. to Set Aside Default J. (Docket # 16) at 8 ¶ II.a.

[85] *Id*. at 11 ¶ II.b.

ownership of the Property."[86]

The Trustee argued further that "[t]he [D]efendants are also estopped from seeking to set aside the [Default J]udgment on res judicata grounds."[87] The Trustee argued that "[t]he Sale Order approving the sale of the subject Property of the bankruptcy estate to [the D]efendant, is a final judgment on the merits on the issue of the bankruptcy estate's ownership of the Property for res judicata purposes."[88] The Trustee argued further that even if the Quit Claim Deed was authentic, because it was unrecorded, the Trustee would be able to avoid the transfer to the Defendants under 11 U.S.C. §§ 544(a)(1) and 544(a)(3).[89]

Finally, the Trustee argued that the Defendants' Rule 60(b) Motion "was not filed within a reasonable time," as required by Fed. R. Civ. P. 60(c)(1).[90]

## L. Kimberly Coleman's Declaration regarding the Quit Claim Deed

On September 14, 2021, the Defendants filed a document entitled "Declaration Regarding the Quit Claim Deed, Dated March 14, 2019, With Respect to 18405 Prairie, Detroit, MI" (the "Coleman Declaration") in which Kimberly Coleman, a notary public, stated that she notarized the Quit Claim Deed, and the Quit Claim Deed is "legitimate:"

---

[86] *Id.* at 8-12; *see also* Docket # 14 at 3-4 ¶ 2 ("The [Quit Claim D]eed produced by [the D]efendants at this late date appears fraudulent. The [Quit Claim D]eed was never delivered to [the D]efendants prior to Celia Ann Williams['s] death or recorded with the Wayne County Register of Deeds prior to the [D]ebtor's bankruptcy filing.").

[87] Pl.'s Mem. of Law in Supp. of Pl.'s Resp. And Obj. To Defs.' Mot. to Set Aside Default J. (Docket # 16) at 12.

[88] *Id.* at 12; *see also* Docket # 14 at 4 ¶ 3.

[89] Pl.'s Mem. of Law in Supp. of Pl.'s Resp. And Obj. To Defs.' Mot. to Set Aside Default J. (Docket # 16) at 13-14.

[90] *Id.* at 14.

KIMBERLY COLEMAN declares as follows:

1. I have reviewed the Quit Claim Deed, dated March 14, 2019, a copy of which is attached to this Declaration as Exhibit A.

2. I am a notary public in the State of Michigan, County of Oakland.

3. I notarized the aforementioned Quit Claim Deed on March 14, 2019.

4. The aforementioned Quit Claim Deed is legitimate.

5. I originally sold the [P]roperty at 18405 Prairie, Detroit, MI 48221 to Celia Williams.

6. On **March 19, 2014**, Celia Williams asked me to prepare and notarize the aforementioned Quit Claim Deed.

In accordance with 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of September, 2021.[91]

## M. Proceedings during discovery: the original of the Quit Claim Deed is missing.

The Court held a lengthy hearing on the Rule 60(b) Motion on September 15, 2021. The Court then entered an order scheduling an evidentiary hearing and allowed the parties to conduct discovery.[92]

After taking the depositions of the Debtor and each of the Defendants, the Trustee's counsel was informed by Defendants' counsel, for the first time, that the Defendants could not locate the original of the Quit Claim Deed. On October 20, 2021, after the "[D]efendants'

---

[91] Docket # 17 (bold added). The bolded language in ¶ 6 of the Coleman Declaration *may* be a typographical error; it *may* be that the date was intended by Ms. Coleman to be "March 19, 2019" rather than "March 19, 2014." But Ms. Coleman's testimony on this point is inconsistent and inconclusive. *See* Tr. 113-14, 124-26 (testimony of Kimberly Coleman).

[92] Docket # 18.

counsel . . . disclosed by email that the alleged March 14, 2019 [Quit Claim D]eed had been lost," the Trustee filed a request for a hearing "to discuss whether [the Rule 60(b) Motion] should be denied now and/or issues with respect to discovery and adjournment of the evidentiary hearing[.]"[93]  The Trustee complained that the Debtor and the three Defendants did not disclose in the Rule 60(b) Motion, nor prior to their depositions, nor during their depositions, taken on October 14, 2021 (the Debtor's deposition) and October 19, 2021 (the depositions of each of the Defendants), "that the alleged original deed was lost" (the "Trustee's October 20 Motion").[94]

During her October 19, 2021 deposition, Camile produced a Quit Claim Deed that did not have the original inked signatures of Celia Williams or the notary public, Kimberly Coleman, but that did contain a raised notary seal.[95]  The Trustee alleged that Camile falsely testified in her deposition that such document was the original Quit Claim Deed.  In the Trustee's October 20 Motion, the Trustee described what happened during Camile's deposition, and later events, as follows:

> 4.  At Camile William[s's] October 19, 2021 deposition, [the D]efendant Camile Williams tried to pass off a copy of the alleged March 14, 2019 [Quit Claim D]eed with a raised seal as the original [Quit Claim D]eed and refused to answer further questions regarding the copy of the [Quit Claim D]eed.  At the end of the deposition[, the D]efendant Camile Williams agreed to produce the alleged original of the [Quit Claim D]eed the next day.
>
> 5.  On October 20, 2021, [the D]efendants' counsel James Warr

---

[93]  Docket # 33 at 1, 2 ¶ 5.

[94]  *Id*. at 1, 2 ¶¶ 3, 5.

[95]  *See* Tr. 69-73 (testimony of Camile).  The raised seal had been only recently added to the non-original copy of the Quit Claim Deed produced at Camile's deposition. *See also* Tr. 117-18 (testimony of Kimberly Coleman).  Kimberly Coleman testified that recently, Camile brought a *copy* of the Quit Claim Deed to her and asked her to put her raised seal on it, and she did that. *See* Tr. 123.

disclosed by email that the alleged March 14, 2019 [Quit Claim D]eed had been lost.

6. Later in the day on October 21, 2021, Mr. Warr produced a copy of the attached Affidavit of Deed recorded on June 15, 2021 in violation of the automatic stay (See Exhibit A).

7. Because [the D]efendants never disclosed that the alleged March 14, 2019 [Quit Claim D]eed was lost in their [Rule 60(b) M]otion or at the September 15, 2021 . . . hearing on the [Rule 60(b) M]otion, [the P]laintiff's discovery and related depositions of the [D]ebtor and parties were thwarted and ineffective.[96]

On October 27, 2021, the Court held a hearing on the Trustee's October 20 Motion. That day, after the hearing, the Court entered a lengthy procedural order. Among other things, that Order extended the deadline for the Trustee, only, to complete discovery. It also required the following things of Camile:

IT IS ORDERED that:
. . . .

4. No later than Monday, November 1, 2021, the Defendant Camile Williams must do the following: (1) make and file with the Court an affidavit stating whether she, or any of the Defendants, or the Debtor Edward Stephone Williams, has the **original** of the [Q]uit-[C]laim [D]eed dated March 14, 2019 and/or the **original** of the **two-page "Affidavit of Deed"** that was recorded on June 15, 2021 with the Wayne County Register of Deeds. If the answer is yes as to either item or both items, the Defendant's affidavit must state who has the original(s). If the answer is yes as to either item or both items, the Defendant Camile Williams must present the original(s) for inspection and copying by the Plaintiff's attorney no later than Monday, November 8, 2021, at a date, time, and place to be discussed and agreed upon by counsel.[97]

---

[96] Docket # 33 at 2 ¶¶ 4-7.

[97] "Order Granting Certain Relief in Response to Plaintiff's Request for Hearing and Order Adjourning November 16, 2021 Evidentiary Hearing" (Docket # 39) (footnotes omitted) (bold added).

**N. Camile's Declaration that the Original of the Quit Claim Deed is missing**

On October 28, 2021, Camile filed a Declaration under penalty of perjury, stating, in part:

> 1. I, the other Defendants and the Debtor have tried to locate the original of the Quit Claim Deed dated March 14, 2019.
>
> 2. Neither I, the other Defendants nor the Debtor have been able to locate the original of the Quit Claim Deed dated March 14, 2019.
>
> 3. Neither I, the other the Defendants nor the Debtor have the original of the Quit Claim Deed dated March 14, 2019.[98]

The filing of this Declaration by Camile was the first time Camile or any of the other Defendants disclosed to the Court that an original of the Quit Claim Deed was lost or otherwise did not exist.[99]

## IV. Jurisdiction

### A. This Court's subject matter jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and E.D. Mich. LR 83.50(a). This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(E), 157(b)(2)(G), and 157(b)(2)(O).

In addition, this adversary proceeding falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr.

---

[98] Docket # 43; *see also* PX-22.

[99] Tr. 65, 75 (testimony of Camile).

28

E.D. Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.*, including Bankruptcy Code §§ 362(d) and 541(a). And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See id.*

## B. The "probate exception" does not apply.

In the Stay-Relief Motion, the Defendants argue that this Court lacks jurisdiction because of the so-called "probate exception" to federal court jurisdiction. They argue that under the probate exception, only a Michigan probate court would have jurisdiction to determine whether the Debtor inherited the Property from his wife, Celia Williams, under the Michigan intestacy statute, as the Trustee contends. As a result, the Defendants say, this Court lacks jurisdiction to determine whether the Property is property of the bankruptcy estate, rather than property of Celia Williams's children, as the Defendants contend. Because of that, the Defendants argue, this Court's Default Judgment entered against the Defendants must be vacated for lack of subject matter jurisdiction.

Defendants are incorrect. The probate exception does not apply.

In *Marshall v. Marshall*, 547 U.S. 293 (2006), the United States Supreme Court discussed the probate exception, and began by characterizing it in this way:

> Among longstanding limitations on federal jurisdiction otherwise properly exercised are the so-called "domestic relations" and "probate" exceptions. Neither is compelled by the text of the Constitution or federal statute. Both are judicially created doctrines stemming in large measure from misty understandings of English legal history.

547 U.S. at 299 (citations omitted). The Supreme Court described the probate exception as one "of distinctly limited scope," *id.* at 310, and held that it applies as follows:

29

> [T]he probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

*Id*. at 311-12.

After M*arshall*, and consistent with it, the Sixth Circuit Court of Appeals, in *Chevalier v. Estate of Barnhard*, 803 F.3d 789 (6th Cir. 2015) (emphasis added), held that the probate exception applies in only three situations:

> Since *Marshall*, we and our sibling circuits have agreed that the probate exception is narrowly limited to three circumstances: (1) if the plaintiff "seek[s] to probate ... a will"; (2) if the plaintiff "seek[s] to ... annul a will"; and (3) if the plaintiff "seek[s] to reach the *res* over which the state court had custody."

803 F.3d at 801 (citations omitted).

As for the third of these situations, the *Chevalier* court held that under *Marshall*, "the probate exception does not divest a federal court of subject matter jurisdiction unless a probate court is already exercising *in rem* jurisdiction over the property at the time that the plaintiff files her complaint in federal court." *Id*. at 804 (italics in original).

Under *Marshall* and *Chevalier*, the probate exception does not apply in this adversary proceeding. First, the Trustee does not seek to probate a will or annul a will. Indeed, this Court has found, and the evidence is undisputed, that Celia Williams died without a will. Second, the Trustee's claims do not seek to reach or affect property that is in the custody of a state probate court. No probate court was exercising *in rem* jurisdiction over the Property at the time the Trustee filed his Complaint in this adversary proceeding. This Court has found, and the evidence is undisputed, that no probate proceeding has ever been filed regarding Celia Williams or any of

30

her property. And even if such a probate proceeding were filed now, the probate exception would not apply. This Court is bound to follow the Sixth Circuit's holding in *Chevalier*, and under *Chevalier*, the probate exception would not apply unless a probate court was already exercising jurisdiction over the Property before the Trustee's federal court Complaint was filed. That clearly was not the case here.

As part of their argument about the probate exception, the Defendants rely on a Michigan statute that vests exclusive jurisdiction regarding probate matters in the probate court. Mich. Comp. Laws Ann. § 700.1302, in relevant part, states:

> The [probate] court has exclusive legal and equitable jurisdiction of all of the following:
>
> (a) A matter that relates to the settlement of a deceased individual's estate, whether testate or intestate, who was at the time of death domiciled in the county or was at the time of death domiciled out of state leaving an estate within the county to be administered, including, but not limited to, all of the following proceedings:
> . . . .
>
> (ii) Estate administration, settlement, and distribution.
>
> (iii) Declaration of rights that involve an estate, devisee, heir, or fiduciary.
> . . . .
>
> (v) Determination of heirs.

Under *Marshall* and *Chevalier*, however, such a state statute cannot divest the federal courts of jurisdiction. *Marshall* involved the same federal bankruptcy jurisdictional statute that applies in this case, 28 U.S.C. § 1334, *see* 547 U.S. at 308, and the Supreme Court held that

> the jurisdiction of the federal courts, "having existed from the beginning of the Federal government, [can]not be impaired by subsequent state legislation creating courts of probate."

547 U.S. at 314 (citation omitted).  In *Chevalier*, the Sixth Circuit relied on *Marshall* to hold the following:

> [In *Marshall*,] the Court firmly rejected the proposition that a federal court's subject-matter jurisdiction is dependent upon state law: "Jurisdiction is determined 'by the law of the court's creation and cannot be defeated by the extra territorial operation of a state statute . . . ."  We therefore look to only federal law to determine whether the probate exception . . . applies.

803 F.3d at 801 (citations omitted).

For these reasons, this Court has subject matter jurisdiction, and such jurisdiction is not divested to any extent by the probate exception.

## V.  Discussion

### A.  The Rule 60(b) Motion

In their Rule 60(b) Motion, the Defendants seek an order vacating the Default Judgment based on Fed. R. Civ. P. 60(b)(1), 60(b)(4), and 60(b)(6).  Fed. R. Civ. P. 60(b) is made applicable to this adversary proceeding by Fed. R. Bankr. P. 9024.  Rule 60(b) states, in relevant part:

> **(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.**  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> > (1) mistake, inadvertence, surprise, or excusable neglect;
>
> . . .
>
> > (4) the judgment is void; [or]
>
> . . .
>
> > (6) any other reason that justifies relief.

Under Rule 60(c)(1), "[a] motion under Rule 60(b) must be made within a reasonable

time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1) (emphasis added).

"The 'public policy favoring finality of judgments and termination of litigation' disfavors granting relief under Rule 60(b)." *Kensu v. Corizon Inc.*, No. 22-1493, 2023 WL 1800276 at *1 (6th Cir. Feb. 7, 2023) (quoting *Yeschick v. Mineta*, 675 F.3d 622, 628 (6th Cir. 2012)).

### 1. Defendants' Rule 60(b)(1) "mistake' argument

This Court has previously described the standards that apply to a motion for relief under Rule 60(b)(1):

> In *Waifersong, Ltd. Inc. v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir. 1992), the Sixth Circuit explained that a determination of whether to set aside a default judgment under Civil Rule 60(b)(1) requires a three-step analysis. First, the moving party must "demonstrate that his default was the product of **mistake**, inadvertence, surprise, or excusable neglect." Only after this threshold requirement has been satisfied may the Court consider the remaining two steps of the analysis; namely "whether the [moving party] has a meritorious defense," and "whether the [non-moving party] will be prejudiced" by relief from judgment. *Id.*

*In re Sharkey,* 560 B.R. 470, 472 (Bankr. E.D. Mich. 2016) (emphasis added).

The Defendants argue that in the entry of the Default Judgment against them, there was a "mistake," within the meaning of Rule 60(b)(1). The "mistake" alleged is that when the Debtor filed his Chapter7 bankruptcy petition on November 17, 2020, he did *not* own the Property. Rather, the Property was owned by the three Defendants, jointly, because their mother, Celia Williams, deeded the Property to them, by means of the alleged March 14, 2019 Quit Claim Deed. Based on this, the Defendants argue, the Debtor did *not* inherit the Property from Celia Williams when she died intestate on June 15, 2019. Thus, the Defendants argue, the Default

Judgment, which is based on the Trustee's theory that the Debtor inherited the Property, is mistaken.

The Court rejects the Defendants' "mistake" argument, however, because it is both factually and legally incorrect.

The Court finds that Celia Williams did not sign and deliver, to the Defendants or to anyone, the alleged March 14, 2019 Quit Claim Deed, or any other deed to the Property. Rather, the Court finds, Celia Williams owned the Property until she died, without a will, on June 15, 2019. The Court also finds that the Debtor *did* inherit the Property from his wife Celia Williams upon her death, under Michigan's intestacy statute, and that the Debtor was the sole owner of the Property when he filed his bankruptcy petition. Thus, the Trustee is correct that the Debtor's bankruptcy estate is the sole owner of the Property.

**a. The Defendants' Rule 60(b)(1) "mistake" argument is factually incorrect.**

The Defendants' evidence presented in support of their story about the alleged March 14, 2019 Quit Claim Deed is not credible. The Court finds that the Quit Claim Deed was not signed by Celia Williams, but instead is a forgery, created by the Debtor and/or one or more of the Defendants only sometime after the Trustee obtained his Default Judgment in this adversary proceeding.

The Court makes these findings based on the following.

• The Quit Claim Deed, which the Defendants allege was signed and delivered by Celia Williams on March 14, 2019, was never recorded. The only recording was of the Affidavit of Deed that the Debtor recorded on June 15, 2021, which had only a *copy* of the Quit Claim Deed attached to it. The Debtor did this recording at a time when *he knew* of the Default Judgment

34

that had been entered almost four months earlier (on February 26, 2021), and when *he knew* that his daughter, Camile, had agreed in writing to buy the Property from the bankruptcy estate for $75,000.00.

If the Quit Claim Deed was genuine — *i.e.*, if it really had been signed by Celia Williams and delivered to the Defendants on March 14, 2019 — then the failure to record that deed would not have made it ineffective under Michigan law.  *See, e.g., Ligon v. City of Detroit*, 739 N.W.2d 900, 905 (Mich. Ct. App. 2007) (citations omitted) ("'A deed takes effect from the time of its delivery, and not from the time of its date, execution or recording.'  As between the parties, an otherwise-conforming deed is valid even if it is not recorded.")  But under the circumstances of this case, the failure by Celia or any of the Defendants, or anyone else, ever to record the Quit Claim Deed raises a suspicion that the deed is *not* genuine.

• That suspicion is heightened by the fact that the notary public, who the Defendants say notarized the Quit Claim Deed on March 14, 2019, obviously was very familiar with the routine and nearly universal practice of recording real estate deeds in Michigan.  That notary, Kimberly Coleman, was not just a notary public.  She also was an experienced real estate agent, and had been a real estate agent since at least 2011, when she was the agent who sold the Property to Celia Williams.[100]  And Ms. Coleman was no stranger to Celia Williams and her husband.  Ms. Coleman testified that after she sold the Property to Celia Williams in 2011, she had "always kept in contact" with Celia Williams over the years, and had a "friendly" though "not real personal" relationship with Celia Williams and the Debtor.[101]

---

[100]  *See* Tr. at 98-100.

[101]  *See id.* at 100.

35

• As Camile testified, despite searches done by the Debtor and all of the Defendants for the original of the Quit Claim Deed, none of them has been able to find and produce an original of the Quit Claim Deed.[102]  Gregory testified that in looking for the original of the deed, "[w]e searched the whole house from the office down to the basement," but did not find it.[103]  Camron testified that she, Camile, Gregory, and the Debtor searched their home for the original of the deed, and did not find it.[104]

• The testimony of the three Defendants, the Debtor, and Kimberly Coleman, about the alleged signing of the Quit Claim Deed by Celia Williams, is strikingly and hopelessly inconsistent.  The inconsistencies, described in detail below, persuade the Court that *none* of this testimony is credible.

Of the three Defendants and the Debtor, only Camile testified that she saw Celia Williams sign the Quit Claim Deed.  Camile's version of events is very different from the version sworn to by the notary, Kimberly Coleman.  And Camile's testimony is very different from Gregory's testimony.  And Camile's testimony is very different from the Debtor's testimony.  And Camron's testimony is self-contradictory.

Camile testified that she was alone with her mother when her mother signed the Quit Claim Deed, and that there was no notary public or any other person present when her mother signed the Quit Claim Deed.  Camile further testified that after signing the Quit Claim Deed, her

---

[102]  *See* PX-22; Docket # 43 (Declaration of Camile Williams, filed October 28, 2021); *see also* Tr. 91 (testimony of Camile).

[103]  Tr. 163 (testimony of Gregory).

[104]  Tr. 141-42 (testimony of Camron).

mother handed it to her, and she (Camile) put it in a filing cabinet, and that the deed was never

removed from that filing cabinet until after this adversary proceeding began. Camile also

testified that the Quit Claim Deed was never given to Camron or Gregory.[105]

---

[105] In her deposition, Camile testified that only she and her mother were present when her mother signed the Quit Claim Deed; "nobody else" was present. (PX-35 at 30 (Dep. of Camile)). During the evidentiary hearing, Camile testified about her mother's signing of the Quit Claim Deed as follows:

> Q. You testified that only you and your mother were present when this alleged March 14th, 2019 [Q]uit [C]laim [D]eed was purportedly signed, correct?
>
> A. Correct.
>
> Q. Nobody else was there, correct?
>
> A. Not in the presence of me, no.
>
> Q. Nobody else was in the presence of you or your mother at the time the [Quit Claim D]eed was signed, correct?
>
> A. With me. Correct.
>
> Q. Okay. And your testimony was that after the [Q]uit [C]laim [D]eed[] was signed by [Celia] Williams, [Celia] Williams immediately handed it to you and you placed it in a filing cabinet located at the Prairie Street property, correct?
>
> A. Correct.
>
> Q. And there was no notary present when [Celia] Williams signed the alleged [Q]uit [C]laim [D]eed, correct?
>
> A. I'm unaware.
>
> Q. Correct?
>
> A. I'm unaware.
>
> Q. Well, we already testified that nobody else besides you and your mother were present when [Celia] Williams signed the alleged [Q]uit [C]laim [D]eed. So I don't know, maybe this was asked and answered, but my question was: there was no notary present when [Celia] Williams signed the [Q]uit [C]laim [D]eed, correct?

But the notary public, Kimberly Coleman, testified that she personally saw Celia Williams sign the Quit Claim Deed at Celia Williams's home, and that she remembered signing the Quit Claim Deed as the notary.[106]  Ms. Coleman testified that she would never notarize a document unless she saw the person sign the document, and she saw Celia Williams sign the Quit Claim Deed.  Ms. Coleman gave her testimony after hearing Camile's testimony, that Camile was alone with her mother when her mother signed the Quit Claim Deed.[107]

---

A. I'm unaware.

Q. You never saw it get notarized, correct?

A. I never saw it get notarized, no.

Q. So earlier you testified that after she signed it she handed it to you and you placed it in the filing cabinet at the Prairie Street [P]roperty. I asked you at your deposition, "Was that your father's file cabinet?" You said, "It's a family file cabinet, sir." Is that right?

A. Correct.

Q. And then I asked you, "Isn't it true the alleged [Q]uit [C]laim [D]eed was not removed from the filing cabinet after you placed it there until it was removed for purpose of this litigation," correct?

A. Correct.

Q. Because you placed the quit claim, this alleged [Q]uit [C]laim [D]eed in the family filing cabinet after your mother signed it, and it was never removed until this litigation, it was never presented to Camron or Gregory before, right?

A. Correct.

Tr. at 79-80 (testimony of Camile).

[106]  *Id.* at 104-05 (testimony of Kimberly Coleman).

[107]  *Id.* at 115-116.  Ms. Coleman testified as follows regarding the purported signing and notarizing of the Quit Claim Deed:

Q.  Okay. Well, let's stick with Exhibit 18 [(a copy of the Quit

38

Claim Deed)] for a minute. The second page of Exhibit 18. It's true, isn't it, that [Celia] Williams didn't actually sign this [Q]uit [C]laim [D]eed in your presence?

A.  No, that's not true. She signed it in my presence. I can't notarize anything that's not signed in my presence.

Q.  Well, actually, would you call what you did a notarization or an acknowledgement  [sic]?

A.  I did both.

Q.  Okay. So isn't it possible for one to acknowledge a deed on a date other than when the person who signed it signed it? In other words, isn't it acceptable under the Michigan Rules of Notary and the Michigan Compiled Laws, that a notary can acknowledge a document at a later date as long as the signer identifies themself through the notary and a person known to them and acknowledges their signature? Do you -- are you aware of that?

A.  No, because I don't -- when I notarize or I acknowledge I make the person sign it in front of me, because I can't authorize something that I haven't seen (unintelligible).

Q.  Well, you heard -- did you hear Camile Williams' testimony this morning that her and [Celia] Williams were alone at the Prairie Street [P]roperty when [Celia] Williams signed the [Q]uit [C]laim [D]eed?

A.  I can't speak to Camile Williams' testimony, I can only speak to what happened with (unintelligible) document.

Q.  All I asked you was, did you hear that testimony?

A.  Yes, I did.

Q.  Okay. And you heard the testimony that Camile Williams then placed that [Q]uit [C]laim [D]eed, after it was signed, in a file cabinet and it never left that file cabinet until these legal matters came up? Did you hear that testimony?

A.  Yes.

Q.  Okay. Where was this [Quit Claim D]eed allegedly, Exhibit 18, where did -- where were you when you signed your name to it?

A.  I'm sorry, I didn't understand your whole question.

39

Thus, Camile's testimony and Ms. Coleman's testimony conflict in a very significant way: Camile says Ms. Coleman was not present when Celia Williams signed the Quit Claim Deed; Ms. Coleman says that she was present and saw Celia Williams sign the Quit Claim Deed. And the testimony of these two witnesses conflicts in another important way. As noted above, Ms. Coleman testified that she would never notarize a document unless she saw the person sign the document, and that she saw Celia Williams sign the deed. But Camile testified in her deposition that even though the notary was not present when Camile saw her mother sign the Quit Claim Deed, that deed "*was already notarized*" *before* her mother signed it.[108]

The Court finds that Camile's testimony, and the testimony of Kimberly Coleman, that Celia Williams signed the Quit Claim Deed before her death, are not credible. This is not only because of the significant conflicts between Camile's testimony and the testimony of Ms.

---

Q. Okay. Well, Exhibit 18, the second page is the [Q]uit [C]laim [D]eed, does that contain your signature?

A. Yes, it does.

Q. Okay. Where were you when you signed that?

A. At [Celia] Williams' home on Prairie Street.

Q. When you notarize deeds, do you place your seal on them?

A. I do.

Q. And do you have a clear, raised seal you use?

A. I do.

*Id.* at 115-17.

[108] *See* PX-35 at 34 (Dep. of Camile) (italics added).

Coleman, but also because of all the other facts and circumstances described in this part of this Opinion.

• One of those circumstances is that in her deposition taken before the evidentiary hearing, Camile tried to mislead the Trustee's attorney about the original of the alleged Quit Claim Deed, and Camile knowingly testified falsely about it. The Court described the background of this in Parts III.M and III.N of this Opinion, above. The Court briefly recaps the events here.

In filing the Rule 60(b) Motion on August 11, 2021, the Defendants attached a copy of the alleged Quit Claim Deed to the motion, but they did not disclose that they did not have an original of the Quit Claim Deed.[109] In her deposition on October 19, 2021, Camile produced a deed that she tried to pass off as the original of the deed, when Camile *knew* that it was not the original. Camile knew that this was a copy, not an original of the deed, because before her deposition Camile had asked the notary, Ms. Coleman, to put her raised notary seal on this copy, and Ms. Coleman did so.[110] This was an obvious but clumsy effort to try to make the deed copy look like an original notarized deed. Camile then brought this document to her deposition and testified falsely, twice, that this document was the original of the Quit Claim Deed.[111] But she knew that it was not the original. Then, when she had to backtrack and admit that the deed was a copy and not the original,[112] Camile testified, falsely, that she had the original of the deed "at

---

[109] *See* Rule 60(b) Motion (Docket # 13) at ¶¶ 7-10; Ex. 1 thereto (Docket # 13 at pdf p. 9 and Docket # 13-1 at pdf p. 7) (copy of the alleged Quit Claim Deed).

[110] *See* Tr. 69, 71, 73 (testimony of Camile); 117-18, 123 (testimony of Kimberly Coleman).

[111] PX-35 at 15 lines 21, 24-25 (Dep. of Camile).

[112] *Id.* at 18 line 8; 18-19, 19 lines 16-18.

41

home."[113]  But she knew that this was not true either.  And after this Court ordered Camile to disclose more details about this deed, Camile finally was forced to admit, in writing under oath on October 28, 2021, that neither she, nor any of the Defendants, nor the Debtor had the original. *See* Parts III.M and III.N of this Opinion, above.

The Court finds that Camile further testified falsely in her deposition, when she was asked "[w]hy was this copy [of the deed] given a raised stamp?" and she answered "I'm not really sure, sir."[114]  Camile knew that this was a false answer, because as the notary Kimberly Coleman testified, it was Camile who brought Ms. Coleman the copy of the deed and asked her to put her raised stamp on the copy.[115]  And Camile repeated this false testimony at the evidentiary hearing, in response to questions from the Court.[116]

In the events just described, Camile acted and testified dishonestly, repeatedly.

• Gregory's testimony contradicted Camile's testimony.  While he did not see his mother sign the Quit Claim Deed, Gregory testified that his mother gave the Quit Claim Deed *to him* in 2019.[117]  This statement contradicts the testimony by Camile that after the Quit Claim Deed was

---

[113]  *Id.* at 18 line 8 ("I have the original at home.").

[114]  *Id.* at 18 lines 9-10.

[115]  Tr. 122-23 (testimony of Kimberly Coleman).

[116]  Tr. 94 (testimony of Camile) ("Q. Do you know how a raised - - there came to be a raised seal on that document?  A. No, sir.  I can't answer that.").

[117]  At the evidentiary hearing, Gregory testified as follows:

Q.  Okay. What is the document?

A.  This is a [Q]uit [C]laim [D]eed.

Q.  Okay. What does the [Quit Claim D]eed do?

42

signed by her mother, her mother handed it to her, and she put it in the filing cabinet, that it was not given to Camron or Gregory, and that it was never removed from that cabinet until after this litigation began. Gregory's testimony is not credible.

• In an important way in her testimony, Camron contradicted herself. First of all, Camron testified that she did not see her mother sign the alleged Quit Claim Deed, and that she never saw any version of that deed until the Defendants talked with their current attorney in July 2021.[118] That was roughly five months after the Default Judgment was entered in this case. Camron contradicted herself in this way: Camron testified initially during the evidentiary hearing that her mother told her about the [Quit Claim D]eed, and told her where it was,[119] but this

---

> A. It gives me the possession of the house from my mother.
>
> Q. Okay. How did you come in possession of this [Quit Claim D]eed?
>
> A. My mother gave it to me once I came off of storm in 2019.
> . . .
>
> My mother presented me this document of me owning the house with my two sisters in 2019. I came off of storm work and she told me that this would be our home no matter what happened to her and my father.

*Id.* at 160-61.

[118] *See* Tr. 145-46 (testimony of Camron).

[119] During the evidentiary hearing, Camron initially testified as follows:

> Q. Did your mother explain why she conveyed the property to you and your siblings?
>
> A. No specific reason. . . . So I could have the home.
>
> Q. So that's why, so you could have a home?
>
> A. Correct.
>
> Q. . . . Are you aware of any particular reason why your mother didn't

testimony by Camron was contradicted and undermined on cross-examination, and by Camron's own earlier deposition testimony. In her deposition, Camron swore that she did not see, *and did not know about the existence of*, the alleged Quit Claim Deed until she and the other Defendants talked with their current attorney in July 2021.[120] Camron's later effort during the evidentiary

---

> convey the property to your father?
>
> A. No.
> . . . .
>
> Q. Did your mother tell you that she was making a plan to take care of you with respect to the house?
>
> A. Yes.
>
> Q. . . . So you were aware of that?
>
> A. Yes.
> . . .
>
> Q. Ma'am, what can you tell the Court about the whereabouts of the original deed . . ., what can you tell the Court?
>
> A. What I can say is that my mother told me where it was and where I can retrieve it and that everything is taken care of and I knew where it was. That's what I can tell you.

(Tr. 138-39, 141).

[120] *See* Tr. 146-47, 153 (testimony of Camron); PX-37 at 7-8 (Dep. of Camron). For example, in her deposition, Camron testified that "before talking to [Defendants' attorney] Mr. Warr," she had not seen the alleged Quit Claim Deed, and had not seen it signed. PX-37 at 7 (Dep. of Camron). She then testified as follows:

> Q. So you didn't even know about this deed until you talked to Mr. Warr, is that right?
>
> A. Well, I --
> . . . .
>
> Q. . . . You didn't know about it, this deed, until you talked to Mr. Warr and he got involved, right?
> . . . .

44

hearing to pull back from that starkly contradictory testimony ("I'm not sure"),[121] is not credible.

• The testimony of the Debtor, Edward Williams, conflicts with the testimony of Camile. By way of background, in his deposition, the Debtor testified that he had been in California working from December 27, 2018 to June 12, 2019, and came home on June 12, 2019, three days before Celia Williams died.[122] Celia Williams's death from a heart attack was unexpected,[123] and even though she had a "bad heart" and was taking "a bunch of medicine," she was never hospitalized.[124] Celia Williams was still working at the time of her death,[125] and according to Camile, her mother died while she was at the movies.[126]

The Debtor testified that when he came home from California on June 12, 2019, his daughter Camile handed him the alleged March 14, 2019 Quit Claim Deed, and he "put it up for safekeeping."[127] This conflicts with Camile's testimony, described above, that when her mother signed the Quit Claim Deed on March 14, 2019, she handed it to Camile, Camile put the deed in

---

Q. **You didn't know about this deed, the existence of this deed which has been marked Exhibit 2, until this whole thing came up with [Defendants' attorney] Mr. Warr, correct?**

A. **Correct.**

*Id.* at 7-8 (Dep. of Camron) (emphasis added).

[121] *See* Tr. 153 line 13 (testimony of Camron).

[122] PX-36 at 22-23 (Dep. of Edward Williams).

[123] *Id.* at 23; PX-35 at 25 (Dep. of Camile).

[124] PX-36 at 23 (Dep. of Edward Williams).

[125] *See id.* at 11, 20; PX-35 at 27 (Dep. of Camile).

[126] *Id.* at 26 (Dep. of Camile).

[127] PX-36 at 24 (Dep. of Edward Williams).

45

a filing cabinet, and it was never removed from that filing cabinet until after this adversary proceeding began. Camile's testimony says nothing whatsoever about her having handed the Quit Claim Deed to her father, the Debtor, when he returned home three days before Celia Williams's death.

• The Debtor also falsely testified in his October 14, 2021 deposition, when he testified that he had the original of the alleged Quit Claim Deed at home.[128] That was false; he did not have the original of the Quit Claim Deed at home, or anywhere else, as discussed above with respect to Camile's similar false testimony.

The Court finds that the Debtor's testimony about the alleged Quit Claim Deed is not credible. First, it conflicts with the testimony of Camile. Second, the Debtor gave false testimony in his deposition. Third, the Debtor's testimony is suspect, because he claims to be a "sovereign citizen," and testified that he does not believe that he is subject to "some" of the laws of the United States, including tax laws, and including some bankruptcy laws.[129] Given this, the

---

[128] The Debtor stated this with confidence in his deposition:

    Q. Do you have the original deed with you?

    A. No, I don't.

    Q. Do you know where it is?

    A. Sure, I do.

    Q. Where is it?

    A. It's at my house.

*Id.* at 26.

[129] In the evidentiary hearing, the Debtor testified:

Court lacks confidence that the Debtor believes that he is bound to testify truthfully in this bankruptcy case, as required by federal law. And fourth, the Defendants' story about Celia Williams signing the alleged Quit Claim Deed before she died is simply unbelievable, based on all the facts and circumstances discussed in this Opinion.

• In closing arguments, the Defendants' attorney called Kimberly Coleman the Defendants' "star witness." But the Court finds that the testimony of Kimberly Coleman, in support of the Defendants' Quit Claim Deed story, is not credible. First, Ms. Coleman's testimony about the deed conflicts in at least two important ways with the testimony of Camile,

---

> Q. You believe you're not subject to federal taxes because of you're a sovereign citizen in the United States, specifically a Moorish national?
>
> A. Yes.
>
> Q. . . . So you believe the federal laws don't apply to you, correct?
>
> A. Some of your federal laws, yes.
> . . . .
>
> Q. . . .[D]o you respect the United States bankruptcy laws?
>
> A. It depends on which laws you're referring to.

Tr. 190-91 (testimony of Edward Williams). The Internal Revenue Service filed a proof of claim based on unpaid federal income taxes in the Debtor's bankruptcy case, in the amount of $341,304.15. (DX-D at 2). The proof of claim stated that the Debtor had not filed a tax return for at least the years 2014 through 2019. (*See id.* at 4-5). In his deposition, the Debtor testified:

> Q. . . . [W]hat's the basis for your not filing federal income tax returns for 2018 and 2019?
>
> A. I'm a sovereign citizen.
>
> Q. Of what?
>
> A. Your United States, the Republic of America.

PX-36 at 35 (Dep. of Edward Williams).

as described above.

A second problem with Ms. Coleman's credibility is that she actively participated in Camile's dishonest effort to pass off a copy of the alleged Quit Claim Deed as the original. Ms. Coleman knowingly agreed to Camile's request to place her raised notary seal on a mere copy of the [the Quit Claim D]eed, and then Camile tried to pass that stamped copy off in her deposition as the original of the [Quit Claim D]eed.

In any event, the Court does not believe Ms. Coleman's testimony that the alleged Quit Claim Deed is legitimate and that she witnessed Celia Williams's signing of that deed. That is simply not believable, given all of the facts and circumstances described in this Opinion.

• Camile's words and conduct, in entering the written Purchase Agreement and its three addenda with the Trustee, are utterly inconsistent with, and are strong evidence against, the later claim by Camile and the other Defendants that Celia Williams deeded the Property to the Defendants before she died. And as discussed below, Camile's words and conduct in this respect are also attributable to the other two Defendants.

The following are some of the events leading to Camile's entering into the Purchase Agreement. As described in Part III.C of this Opinion, the Trustee's counsel mailed a letter to the Debtor and each of the Defendants on March 10, 2021, stating that the bankruptcy estate owned the Property, and demanding rent of $1,500.00 per month. The letter also stated that if none of the Defendants or the Debtor were interested in purchasing the Property from the estate, "the Trustee will hire a broker to market the [P]roperty for sale."[130] This letter led to Camile entering into the April 10, 2021 written agreement to purchase the Property from the bankruptcy

---

[130] PX-4 at 1.

estate.

Although the Defendants deny receiving the March 10, 2021 letter, the Court finds that each of the Defendants received the letter in the mail shortly after March 10, 2021. In addition, the Debtor admitted in his testimony that he talked with Camile about the March 10, 2021 Letter.[131]

The Debtor further admitted that two of the Defendants, Camile and Gregory, received the February 26, 2021 Default Judgment that the Clerk's office mailed to them, and asked the Debtor about it, and the Debtor then called the Trustee's attorney about the Property.[132] All of this happened sometime before the Debtor fired his bankruptcy attorney on March 23, 2021, and after firing his attorney, the Debtor continued communicating with the Trustee's attorney about the Property.[133] The Debtor further admitted that he told his children (the Defendants) about his bankruptcy case "around the time" that the Trustee's attorney "started trying to come after this house," somewhere in the "springtime of 2021."[134] The Debtor also testified that he told his children about the Trustee's complaint, "around the springtime" of 2021; and that at that time he "sat them down and told them what was going on."[135] And the Debtor testified that after talking only to Camile initially, "when things started getting really serious, that's when I brought my

---

[131]  PX-36 at 49-50 (Dep. of Edward Williams); Tr. 198-99 (testimony of Edward Williams).

[132]  PX-36 at 48-49 (Dep. of Edward Williams).

[133]  *See id.*  The Debtor's testimony was that he fired his bankruptcy attorney after first contacting the Trustee's attorney.  March 23, 2021 was the date on which the Debtor sent an e-mail terminating his bankruptcy attorney.  *See* PX-5.

[134]  Tr. 185-87 (testimony of Edward Williams).

[135]  *Id.* at 186-87.

other two children, Gregory and Camron, hey, you all come here, we need to talk.  This is what's

going on."[136]

The Debtor's testimony included the following:

> Q. So it was after receipt of this [March 10, 2021] letter that
> Camile decided she wanted to purchase the house, correct?
>
> A. Well, we didn't want to lose the house by any means necessary.
> . . .
>
> Q. So she knew about the trustee's complaint, she knew about the
> default judgment, she knew about the letter, and that's when she
> made a decision to buy the property from the bankruptcy estate,
> correct?
>
> A. Well, after we talked about it, we decided that that might be a
> good way to go, yes.[137]

Camile's conduct in entering into the April 10, 2021 Purchase Agreement, and the words

in that agreement, are described in Part III.D of this Opinion.  Camile's conduct and words are

both utterly inconsistent with the Defendants' claim now that they, rather than the bankruptcy

estate, own the Property.  And Camile admitted in her testimony that at no time before she signed

the Purchase Agreement, or thereafter, did Camile ever tell the Trustee or his attorney that *the*

*Defendants* owned the Property, or that Celia Williams had deeded the Property to the

Defendants.[138]  Nor is there any credible evidence that either of the other Defendants, or the

Debtor, ever told the Trustee or the Trustee's counsel this.  This silence, and Camile's entering

---

[136]  *Id.* at 195; PX-36 at 29 (Dep. of Edward Williams).

[137]  Tr. 199.

[138]  *See* PX-35 at 55 (Dep. of Camile) at 55, quoted in footnote 69 of this Opinion; Tr. 37
(testimony of Camile).

into the Purchase Agreement, both are inexplicable, *if* the Defendants' story about Celia Williams having signed the Quit Claim Deed is true, because, as detailed above, Camile, Gregory, and the Debtor all claim that they knew of the Quit Claim Deed beginning back in 2019.

Camile's *conduct* in not telling the Trustee or the Trustee's attorney about the alleged 2019 Quit Claim Deed, and at the same time signing the Purchase Agreement, is itself strong evidence that the Defendants' story about the 2019 Quit Claim Deed is false, and that the Defendants do not own the Property. Camile obviously is an intelligent person. It is utterly implausible that a person who believes they own a piece of property would (1) agree in writing to purchase *their own property* from a non-owner, for $50,000.00 (a price later increased to $75,000.00); and (2) not tell the other party that they already own the property. And Camile did not just sign the Purchase Agreement. She paid the Trustee a deposit of $5,000.00.[139] And she later added to that deposit under the addenda she signed, making a total of $10,000.00 in payments to the Trustee, as deposits under the Purchase Agreement and its three addenda.

Camile admitted that she read the Purchase Agreement, and reviewed it with the Debtor, before she signed it.[140] And in the wording of the Purchase Agreement, *Camile clearly agreed that the bankruptcy estate "owns" the Property.*[141]

Camile's conduct in signing the Purchase Agreement, and the words she agreed to in that agreement, were reinforced by the three written addenda to the Purchase Agreement that Camile

---

[139] *See* PX-6 at 2, ¶ 3.a.

[140] Tr. 36 (testimony of Camile).

[141] *See* PX-6 at 1, first two paragraphs (italics added); discussion in Part III.D of this Opinion.

51

later signed. Those addenda are described in detail in Parts III.F and III.I of this Opinion. Camile signed the First Addendum on May 14, 2021. That addendum increased the purchase price from $50,000.00 to $75,000.00, and extended the closing deadline to June 30, 2021. Camile signed the Second Addendum on June 18, 2021, and it extended the closing deadline to July 31, 2021, and required Camile to pay an additional deposit of $2,000.00. Camile signed the Third Addendum on July 21, 2021, and it extended the closing deadline to August 31, 2021, and required Camile to pay an additional deposit of $3,000.00. This brought the total deposit amount that Camile paid to the Trustee to $10,000.00.

As described in Parts III.F and III.I of this Opinion, in each of the three addenda that she signed, Camile repeated in writing her agreement that *the bankruptcy estate "owns . . . the Property"* (italics added).

Camile's conduct and words in the Purchase Agreement and the three addenda also are attributable to the other Defendants, Gregory and Camron. Gregory and Camron obviously knew about the Purchase Agreement and the three addenda, and they actively participated in and supported Camile's agreements. As Camile admitted, all three of the Defendants and the Debtor did all of the following: (1) they all helped fund the $5,000.00 deposit that was paid to the Trustee with the April 10, 2021 Purchase Agreement;[142] (2) they all agreed amongst themselves to request the extension of the closing deadline by means of the Second Addendum signed June 18, 2021;[143] (3) they all helped fund the additional $2,000.00 deposit that was paid to the Trustee

---

[142] *See* Tr. 37 (testimony of Camile).

[143] *See id.* at 45 (testimony of Camile).

with that Second Addendum;[144] (4) they all agreed amongst themselves to request the extension of the closing deadline by means of the Third Addendum signed July 21, 2021;[145] and (5) they all helped fund the additional $3,000.00 deposit that was paid to the Trustee with that Third Addendum.[146]

• In finding the Defendants' story about the 2019 Quit Claim Deed to be untrue, the Court is mindful that in their testimony given in support of that story, all of the Defendants and the Debtor have a very strong motive to testify falsely. They all have lived in the Property since 2011, and if they can persuade the Court that they own the Property, it would be unnecessary for them to buy the Property from the bankruptcy estate for the $75,000.00 that Camile agreed to pay under her Purchase Agreement with the Trustee. The Defendants would not have to pay anything to the bankruptcy estate for the Property.

Also, if the Court were to find that the Defendants own the Property, the Property would be protected from the tax liens of the IRS, to whom the Debtor owes $341,304.15, according to the Proof of Claim filed by the IRS.[147] The IRS tax liens are discussed in Parts III.E and footnote 129 of this Opinion, above. The IRS claims to have a lien in all of the Debtor's property, in the amount of $196,322.08, based on federal tax liens filed for the Debtor's unpaid income taxes for

---

[144] *See id.* at 46 (testimony of Camile) ("We did this together.").

[145] *See id.* at 47-48 (testimony of Camile) ("We agreed on it. We all sat down and agreed on it.").

[146] *Id.* at 49 (testimony of Camile) ("Q. Did you fund that $3,000.00 personally? A. We all funded it together. Q. Who's 'all'? . . . A. Myself, Gregory Williams, Camron Williams, and Edward Williams.").

[147] *See* DX-D at 2 (IRS Proof of Claim filed in the Debtor's bankruptcy case).

the years 2005 through 2012.[148]  If the Court finds that the Debtor owned the Property when he filed bankruptcy, the Property would be subject to the IRS tax liens.  But if the Court finds that the Defendants own the Property, then the Property would not be encumbered by the tax liens.

As discussed in footnote 129, it appears that the Debtor has not filed a federal income tax return for at least the years 2014 through 2019, and his stated reason for not filing tax returns is that he is "a sovereign citizen."  For many years, and from the beginning, the Debtor has wanted to avoid having the Property be subject to IRS efforts to collect the Debtor's unpaid income taxes.[149]

• Before the Debtor filed his bankruptcy case in 2020 and before the Trustee filed this adversary proceeding in 2021, the Debtor acted, in at least one way, as if *he* was the owner of the Property, and represented that he was the owner of the Property.  The Debtor obtained homeowners insurance on the Property, naming himself as the sole insured, during the period September 11, 2019 through at least September 11, 2022.[150]

• The notary public, Ms. Coleman, testified that she is familiar with the signature of Celia Williams, and then admitted that the purported signature of Celia Williams on the alleged

_____

[148]  *See id.* at 2, 4.

[149]  For example, the Debtor testified that his wife Celia originally bought the Property (in 2011) in her name alone so that it would be out of reach of the IRS:

> Q.  Okay. Why did [Celia] Williams purchase the home by herself?
>
> A.  Well, the IRS says that I owe them a lot of money, so I didn't want to have anything to do with the house to jeopardize their wellbeing.

Tr. 180 (testimony of Edward Williams).

[150]  *See* Tr. 200-01 (testimony of Edward Williams); PX-32 (homeowners insurance declarations); Tr. 85-86 (testimony of Camile).

Quit Claim Deed does not look like the verified signature of Celia Williams on other documents.[151]  For example, Ms. Coleman testified that the Quit Claim Deed signature "doesn't look anything like" Celia Williams's signature on a mortgage dated November 21, 2013.[152]  For another example, Ms. Coleman testified that Celia Williams's purported signature on the Quit Claim Deed does not look like Celia Williams's signature on her General Membership Card with Michigan First Credit Union dated February 16, 2018.[153]

• This testimony by Ms. Coleman and the related exhibits were admitted into evidence without objection.  The Court has compared the signatures in the same way Ms. Coleman did, and the Court finds that the purported signature of Celia Williams on the alleged Quit Claim Deed, on the one hand, and the verified signatures of Celia Williams on the November 21, 2013 mortgage and the February 16, 2018 credit union membership card, on the other hand, are very different.  The signatures of Celia Williams on the latter two documents (PX-25 and PX-26) are very much alike, and they are very different from the purported Celia Williams signature on the alleged Quit Claim Deed.  This difference is so obvious in this case that it can be and is established without the need for the testimony of any handwriting expert.  *See generally United States v. Saadey*, 393 F.3d 669, 679 (6th Cir. 2005) ("[T]he federal rule permits the trier of fact to compare documents with other documents which have been authenticated.  Under Fed. R.

---

[151]  *See* Tr. 119-122 (testimony of Kimberly Coleman).

[152]  *Id.* at 120 (testimony of Kimberly Coleman) (comparing signature on the Quit Claim Deed to the signature on the fourth page of PX-26 (mortgage dated November 21, 2013 and recorded December 19, 2013)).

[153]  Tr. 121 (testimony of Kimberly Coleman) (comparing signature on the Quit Claim Deed to the signature dated February 16, 2018 on the fourth page of PX-25 (General Membership Card with Michigan First Credit Union).

Evid. 901(b)(3), a lay person can identify and compare signatures."); *In re Ludwick*, 185 B.R. 238, 241 (Bankr. W.D. Mich. 1995) (same) (bankruptcy court found, by comparing signatures, that a debtor's signature on a bankruptcy petition had been forged by his attorney).

The foregoing handwriting comparisons further show that Celia Williams did *not* sign the alleged 2019 Quit Claim Deed. Celia Williams's purported signature on that deed is a forgery.[154]

For all the foregoing reasons, the Court finds that the Defendants' Rule 60(b)(1) "mistake" argument is factually incorrect. Celia Williams did not sign the alleged March 14, 2019 Quit Claim Deed or deliver such a deed to any of the Defendants. Rather, Celia Williams alone owned the Property until she died, without a will, on June 15, 2019.

**b. The Defendants' Rule 60(b)(1) "mistake" argument also is legally incorrect.**

As a result, the Defendants' "mistake" argument also is legally incorrect. The Debtor inherited the Property from his wife Celia Williams upon her death, under Michigan's intestacy statute, and the Debtor was the sole owner of the Property when he filed bankruptcy. The bankruptcy estate therefore now owns the Property.

Under Michigan's intestacy statute, when Celia Williams died intestate on June 15, 2019, her surviving spouse, the Debtor, became entitled to the following share of Celia Williams's property: "[t]he first $150,000.00, plus 1/2 of any balance of the intestate estate[.]" *See* Mich.

---

[154] The Trustee argues that other handwriting comparisons show that the forgery was done by the Debtor, Edward Williams. The Court cannot make such a finding. The Trustee asks the Court to compare the purported signature of Celia Williams on the alleged Quit Claim Deed, on the one hand, with the Debtor's signature of his own name on three documents filed in the Debtor's bankruptcy case (PX-27), on the other hand. That comparison shows that in all three of the latter documents, the signature of the Debtor's last name, Williams, is identical in distinct ways, but also is different in one very distinct way, from the "Williams" signature on the alleged Quit Claim Deed. This handwriting comparison, standing alone, does not enable the Court to find that the Debtor is the one who forged Celia Williams's signature on the alleged Quit Claim Deed. But neither does this handwriting comparison rule out the Debtor as the forger.

Comp. Laws Ann. § 700.2102(1)(b).

As a practical and legal matter, this means that the Debtor was entitled to the entire intestate estate, because that estate was worth far less than $150,000.00.  The evidence shows that the intestate estate of Celia Williams consisted of real estate, namely full ownership of the Property, plus some personal property of only nominal value.[155]  The Defendants have not alleged, or presented any evidence to suggest, that the value of the real estate plus the personal property was anywhere near $150,000.00 or more.

The evidence shows that the value of the real estate (the Property) likely was not more than $75,000.00.  That was the purchase price for the Property that Camile and the Trustee agreed to in the Purchase Agreement.  And that $75,000.00 purchase price was approved by the IRS in settling its objection that the initial proposed $50,000.00 purchase price of the Property was too low.  The $75,000.00 purchase price then was approved by this Court as reasonable, when the Court authorized the sale in the May 17, 2021 Sale Order.[156]

The Defendants have suggested, without citing any authority, that title and ownership of the Property could not have passed to the Debtor after Celia Williams's death, because there have been no probate proceedings regarding the estate of Celia Williams.  But that is incorrect.  Under

---

[155]  During the evidentiary hearing, the Debtor testified that apart from the Property, when Celia Williams died, she did not own anything of value.  *See* Tr. 200 (testimony of Edward Williams).  In his deposition, the Debtor testified that when Celia Williams died, she only owned a car — a 2014 Ford Fusion, which was later surrendered to a secured creditor; some "raggedy" furniture jointly owned with the Debtor; and some appliances.  *See* PX-36 at 38-40 (Dep. of Edward Williams)).  Other evidence in the record indicates that the vehicle was owned by the Debtor only, and not by Celia Williams.  *See* footnote 158 below.  As for the furniture, the Debtor listed "[m]iscellaneous furniture" in his Schedule A/B filed in his bankruptcy case, as having a value of $800.00.  (Schedule A/B, item 7 (Docket # 1 in Case No. 20-51655 at pdf p. 11)).  The Debtor's Schedule A/B did not list any appliances.

[156]  *See* discussion in Parts III.E through III.G of this Opinion, above.

Michigan law, because the Property is real estate, ownership of the Property passed to the Debtor immediately upon the death of Celia Williams on June 15, 2019, without the need for any probate proceedings. As the Michigan Court of Appeals has explained,

> Under Michigan law, title to personal property does not transfer to a decedent's heirs at the moment of death. *Michigan Trust Co v. Grand Rapids,* 262 Mich. 547, 550; 247 NW 744 (1933). Rather, title to personal property passes to the executor or administrator of the decedent's estate upon appointment. *Id.* **However, the same is not true of real property: title to real property vests in a decedent's heirs at the moment of the decedent's death, subject to divestment in order to pay the estate's creditors.** *Id.,* citing *In re Palmer,* 1 Doug 422, 424–425 (1844) (stating that, because real estate descends immediately to the decedent's heirs, the administrator of an estate has no authority to sell or convey the real estate except as provided by statute—namely, when the decedent's personal property is insufficient to pay the decedent's debts).

*Aldrich v. Estate of Aldrich*, No. 300412, 2012 WL 205750, at *2 (Mich. Ct. App. Jan. 24, 2012) (footnote omitted) (emphasis added). In a footnote, the *Aldrich* court noted that "[u]nder Michigan law, an heir is any person that is entitled to a decedent's property under the statutes of intestate succession. *See* [Mich. Comp. Laws §] 700.1104[P])." *Id*. at *2 n.2.[157]

Thus, in the absence of probate proceedings, ownership of the personal property owned by Celia Williams at the time of her death did not pass directly to the Debtor. As further explained by the Michigan Supreme Court in *Michigan Trust Co v. City of Grand Rapids,* 247 N.W. 744, 746 (1933) (citation omitted), title to such personal property "'remains in abeyance until the appointment of an administrator and then vests in him, in trust, in his official capaicty . . . .'"

---

[157] Effective beginning June 27, 2016, the definition of "Heir" is found at Mich. Comp. Laws § 700.1104(p).

But the rule is different with real estate. Unlike with personal property,

> "the title to the real estate vests in the heir at the date of the death
> of the ancestor. Real estate is not assets in the hands of a personal
> representative, and, unless otherwise charged by the terms of a
> will, is subject only to the contingency of a sale of so much thereof
> as may be necessary to pay the debts of the estate in case there is
> not sufficient personal estate for that purpose. . . ."

*Id.* (citation omitted).

The Defendants have not alleged, or presented any credible evidence to suggest, that Celia Williams died leaving unpaid debts to creditors that were not later paid or settled.[158] In any event, even if a probate case were filed and there were unpaid creditors of Celia Williams left after the liquidation of her personal property, only those unpaid creditors would have standing to try to reach the Debtor's ownership interest in the real estate (the Property); the Defendants would not have such standing. Nor would Defendants have standing to contest the Trustee's claims in this adversary proceeding on that basis. In short, the Defendants have no interest of any kind in the Property.

Under Michigan law, then, the Debtor was the sole owner of the Property beginning when

---

[158] The only evidence in the record that Celia Williams died owing any debt is certain testimony by the Debtor in his deposition, about a car loan. There the Debtor testified that he and Celia Williams were co-debtors on a car loan for a 2014 Ford Fusion that Celia owned. (PX-36 at 39-40 (Dep. of Edward Williams)). The Debtor testified that after Celia Williams died, he had the secured creditor repossess the vehicle, and that, presumably after the creditor sold the vehicle, the creditor later sent the Debtor a bill for almost $10,000.00. The Debtor says he never paid that debt. (*Id.*) Although the Debtor testified that he had "cosigned" with Celia for this car loan, (*id.* at 39), a proof of claim filed by Ford Motor Credit Company LLC shows that only the Debtor, and not Celia, was liable on this car loan, and that only the Debtor, and not Celia, owned this vehicle. That proof of claim was filed on February 17, 2021, and is Claim No. 5-1 on this Court's claims register in the Debtor's bankruptcy case. The claim is in the amount of $10,074.76 and the proof of claim says that it is for "[b]alance owing on retail installment contract for a 2014 Ford Fusion." (Claim No. 5-1 in Case No. 20-51655, at pdf p. 2). The retail installment contract attached to the proof of claim was signed only by Edward Williams, and it shows only Edward Williams as the buyer of the vehicle and obligor on the car loan. (*Id.* at pdf p. 4).

Celia Williams died on June 15, 2019, and continuing until the Debtor filed his voluntary bankruptcy petition on November 17, 2020. At that time, the bankruptcy estate succeeded the Debtor as the sole owner of the Property, under 11 U.S.C. § 541(a)(1).[159]

For these reasons, the Defendants' Rule 60(b)(1) "mistake" argument is both factually and legally incorrect. There was no "mistake" in the entry of the Default Judgment in this case. And for the same reasons, it is clear that the Defendants do not meet another requirement for relief under Rule 60(b)(1) — namely, they do not have any "meritorious defense" to the Trustee's claims and the Default Judgment.

For these reasons, the Defendants do not meet the requirements for relief from judgment under Civil Rule 60(b)(1).

### 2. The Defendants' Rule 60(b)(4) and Rule 60(b)(6) arguments

As described in Part III.J of this Opinion, the Defendants also seek relief from the Default Judgment under Civil Rules 60(b)(4) and 60(b)(6), based on their allegation that none of the Defendants actually received the Summons and Complaint that the Trustee's counsel mailed to them. For the reasons stated below, however, the Court finds that each of the Defendants did actually receive the Summons and Complaint, well before the Default Judgment was entered. There is no basis to find the Default Judgment to be "void" under Rule 60(b)(4), or to grant relief under Rule 60(b)(6).

---

[159] It follows that the Debtor's action in recording the "Affidavit of Deed" on June 15, 2021, as described in Part III.H of this Opinion, was a violation of the automatic stay under 11 U.S.C. § 362(a)(3) (which provides that the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of . . . any act . . . to exercise control over property of the estate"). As an automatic stay violation, that action is void and of no effect. *See Easley v. Pettibone Michigan Corp.*, 990 F.2d 905, 911 (6th Cir. 1993).

## a. Applicable standards under Civil Rule 60(b)(4)

This Court recently discussed what must be shown to establish that a judgment is "void"

under Civil Rule 60(b)(4):

> In discussing when a judgment is "void" under Fed. R. Civ. P.
> 60(b)(4), . . . the United States Supreme Court has held that "'[a]
> judgment is not void' . . . simply 'because it is or may have been
> erroneous.'" *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S.
> 260, 270, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010) (citations
> omitted). Rather, a judgment is void "only in the rare instance
> where a judgment is premised either on a certain type of
> jurisdictional error or on a violation of due process that deprives a
> party of notice or the opportunity to be heard." *Id.* at 271, 130
> S.Ct. 1367 (citations omitted). And only a narrow class of
> jurisdictional defect can make a judgment or order void:
>
> > Federal courts considering Rule 60(b)(4) motions
> > that assert a judgment is void because of a
> > jurisdictional defect generally have reserved relief
> > only for the exceptional case in which the court that
> > rendered judgment lacked even an "arguable basis"
> > for jurisdiction. *Nemaizer v. Baker*, 793 F.2d 58, 65
> > (C.A.2 1986); *see, e.g.,* [*United States v.*] *Boch
> > Oldsmobile,* [*Inc.*, 909 F.2d 657,] 661–662 [(1st Cir.
> > 1990)] ("[T]otal want of jurisdiction must be
> > distinguished from an error in the exercise of
> > jurisdiction, and . . . only rare instances of a clear
> > usurpation of power will render a judgment void"
> > (brackets and internal quotation marks omitted)).
>
> *Id.*

*Vining v. Comerica Bank* (*In re M.T.G., Inc.*), 646 B.R. 1, 166 (Bankr. E.D. Mich. 2022).

Here, there was no due process violation in the entry of the Default Judgment. As

discussed below, each of the Defendants was properly served with the Summons and Complaint

and had an opportunity to respond and be heard. The Court had personal jurisdiction over each

of the Defendants. And as discussed in Part IV of this Opinion, this Court had subject matter

jurisdiction over the adversary proceeding. The Default Judgment is not void, and therefore, the

Court cannot grant relief under Fed. R. Civ. P. 60(b)(4).

**b. Applicable standards under Civil Rule 60(b)(6)**

This Court has previously discussed what must be shown to obtain relief from a judgment

under the Rule 60(b)(6) ground, "any other reason that justifies relief:"

> Under [Rule 60(b)(6)], relief is appropriate "only in exceptional or extraordinary circumstances which are not addressed by the first five numbered clauses of the Rule." *In re Cassidy*, 273 B.R. 531, 537 (Bankr., N.D. Ohio 2002)(citing *Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund*, 249 F. 3d 519, 524 (6th Cir. 2001)). "This is because 'almost every conceivable ground for relief is covered' under the other subsections of Rule 60(b)." *Id.* (citing *Olle v. Henry & Wright Corp.*, 910 F. 2d 357, 365 (6th Cir. 1990)).
> . . . .
>
> In addition, cases have held that relief under Rule 60(b)(6) requires a showing not just of "extraordinary circumstances," but rather "extraordinary circumstances suggesting that [the party seeking relief] is faultless in the delay." *See Q Technology v. Allard* (*In re Trans-Industries, Inc.*), [No. 08-14655,] 2009 WL 1259991 (E.D. Mich., May 1, 2009) at *6 (citing *Pioneer* [*Inv. Services Co. v. Brunswick Associates Ltd. Partnership*], 507 U.S. [380] at 392-93 [113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)]).
>
> *Conopco, Inc. v. Sadeghi-A* (*In re Sadeghi-A*), 597 B.R. 403, 410 (Bankr. E.D. Mich. 2019) [()quoting *In re Schulze*, 560 B.R. 305, 308 (Bankr. E.D. Mich. 2016)[)].

*In re Mather*, 633 B.R. 309, 313 (Bankr. E.D. Mich. 2021).

The Defendants have failed to show that such "exceptional or extraordinary

circumstances" exist in this case. The circumstances here — a default judgment entered due to

the Defendants' failure to timely file an answer to the Complaint — is addressed by Rule 60(b)(1), particularly the "mistake" and "excusable neglect" provisions of Rule 60(b)(1), and the Defendants have not made a showing of such "mistake" or "excusable neglect" under that rule. Not only are there no such "exceptional or extraordinary circumstances" here, but also the Defendants have not shown that they are "faultless in the delay." The Court will not grant the Defendants relief under Fed. R. Civ. P. 60(b)(6).

### c. The Summons and Complaint were both properly served upon, and actually received by, each of the Defendants.

On the same day the Complaint was filed, January 25, 2021, the Summons and Complaint were mailed by First Class Mail to each of the three Defendants by the Trustee's counsel. These documents were mailed to each of the Defendants at the home address they shared, *i.e.*, the address of the Property.[160] Each of the Defendants had lived at that address since 2011, when Celia Williams bought the Property, and more specifically, the evidence is clear that each of the Defendants was actually living at that address during the time period from January 2021 forward.[161]

Under Fed. R. Bankr. P. 7004(b)(1), such service by mail addressed to the Defendants' home was proper.[162] And such service by mail was "complete on mailing." *See* Fed. R. Bankr. P. 9006(e). Such service certainly was "reasonably calculated to reach [the] interested parties,"

---

[160] *See* Part III.B of this Opinion; PX-2 at pdf p. 8; *see also* Docket ## 2, 3; DX-B.

[161] *See* Tr. 5-6, 22 (testimony of Camile); Tr. 131-32 (testimony of Camron); Tr. 156 (testimony of Gregory); PX-36 at 29-31 (Dep. of Edward Williams).

[162] Rule 7004(b)(1) permits service upon an individual by first class mail by "mailing a copy of the summons and complaint to the individual's dwelling house or usual place of abode . . . ." Fed. R. Bankr. P. 7004(b)(1).

and therefore it complied with the constitutional requirements of procedural due process. *See generally Citizens Ins. Co. v. Harris*, No. 16-CV-10428, 2016 WL 3743133, at *3 (E.D. Mich. July 13, 2016) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 318 (1950)). Because there was no due process violation, the Default Judgment is not "void" within the meaning of Rule 60(b)(4).

The Defendants do not dispute any of the foregoing facts, and they do not dispute that service of process on them was proper and complete on mailing. Rather, the Defendants simply deny that any of them actually received the Summons and Complaint in the mail, and for that reason, the Defendants deny that they knew of the Trustee's Complaint in time to respond and avoid a default judgment.

The Court finds otherwise. Considering all the evidence, the Court finds that each of the Defendants actually received the Summons and Complaint in the mail shortly after the Trustee's counsel mailed those items to the Defendants' home on January 25, 2021.

The finding is supported by the fact that the Trustee's counsel mailed these documents to each of the Defendants. That fact of the Trustee's mailing logically tends to show that the mailed items were delivered by the post office to the Defendants at their home address. And there is other evidence of receipt, discussed below.

The Trustee argues that there is a rebuttable presumption that the mail he sent to the Defendants was actually received by them, and that the Defendants have not rebutted the presumption. Such a presumption is sometimes called the "mailbox rule." But the Court finds that this presumption was rebutted by the Defendants, such that the presumption drops out of the case.

The Sixth Circuit has described the mailbox rule most recently in this way:

> The common law mailbox rule applies when there is a question regarding whether a document was received by the addressee. The "proper and timely mailing of a document raises a rebuttable presumption that [the document] is received by the addressee." *Carroll v. Comm'r*, 71 F.3d 1228, 1232 (6th Cir.1995) (quoting *Anderson v. United States*, 966 F.2d 487, 491 (9th Cir.1992)). This Circuit has determined that this rebuttable presumption arises upon proof that the document was "properly addressed, had sufficient postage, and was deposited in the mail. [*Bratton v. Yoder Co.* (]*In re Yoder Co.*[)], 758 F.2d 1114, 1118 (6th Cir.1985). Sufficient proof that the letter was mailed includes signed receipts from certified mail and documentation of mailing contained in a party's business records. *Custer v. Murphy Oil USA, Inc.*, 503 F.3d 415, 420 (5th Cir.2007). Once the party provides sufficient proof to raise the mailbox rule presumption, this presumption may be rebutted by testimony of non-receipt of the document. *Yoder*, 758 F.2d at 1118. ("Testimony of non-receipt, standing alone, would be sufficient to support a finding of non-receipt.")

*Laird v. Norton Healthcare, Inc.*, 442 F. App'x 194, 198 (6th Cir. 2011). When the mailbox rule applies, the presumption also is that the mail was *timely* received:

> Under the common law mailbox rule, it "is well settled that 'if a letter properly directed is proved to have been either put into the post office or delivered to the postman, it is presumed, from the known course of business in the post-office department, that **it reached its destination at the regular time, and was received by the person to whom it was addressed**.'"

*Id.* at 199 (quoting *Rosenthal v. Walker*, 111 U.S. 185 (1884) (emphasis added)).

As indicated in the first passage quoted above from the *Laird* case, the Sixth Circuit has held that the rebuttable presumption of receipt is rebutted by "testimony of non-receipt." Such testimony, "standing alone," is sufficient to rebut the presumption. *See Bratton v. Yoder Co.* (*In re Yoder Co.*), 758 F.2d 1114, 1118 (6th Cir.1985).

Of course, it is easy for someone to simply deny that they received something in the mail.

65

Probably for this reason, a number of lower court cases within the Sixth Circuit have struggled against the broad statement in *Yoder*, that the presumption is rebutted by mere testimony of non-receipt. Those courts have interpreted this statement in *Yoder* narrowly. In *Citizens Ins. Co. v. Harris*, 2016 WL 3743133, at *2, the district court stated:

> The facts of *Yoder* involved much more than a simple denial of non-receipt, and courts have interpreted the broad language of *Yoder*, that an affidavit of non-receipt can rebut the presumption, in a very narrow fashion. [Ohio Cas. Ins. Co. v. Hoback (] *In re Hoback*[)], 200 B.R. 28, 30-31 (Bankr. W.D. Ky. 1995) (collecting cases).

The bankruptcy court in *Ohio Cas. Ins. Co. v. Hoback* (*In re Hoback*), 200 B.R. 28, 31 (Bankr. W.D. Ky. 1995) interpreted *Yoder* as follows:

> The present case does not present the same situation as *Yoder*. To gain the protection of *Yoder,* detailed evidence of a party's failure to receive notice must be presented. In *Yoder,* the creditor presented evidence that 1) its name did not appear on the mailing matrix; 2) two other similar creditors did not receive the same notice; and 3) that there was no record of whether the creditors' address was on the labels used to mail the notice. *Yoder* involved far more than a simple claim of non-receipt.
>
> To allow a simple denial of receipt, standing alone, to rebut the presumption would be to destroy the presumption entirely. There has been no "indication in other Sixth Circuit opinions that *Yoder's* categorical language on presumption will be given expansive reading. To do so . . . would vitiate the effectiveness of notice given by mail and preclude the finality required for the administration of bankruptcy cases." *In re Messics,* 159 B.R 803, 806 (Bankr. N.D. Ohio 1993).

Another bankruptcy court noted that "*Yoder's* holding that a denial of receipt rebuts the presumption of receipt is a minority view and has been criticized by a number of courts." *In re Bennett*, 135 B.R. 72, 76 n.1 (Bankr. S.D. Ohio 1992) (citations omitted). That court further noted that:

> *Yoder's* rationale is subject to the following criticism: "If a party were permitted to defeat the presumption of receipt of notice resulting from the certificate of mailing by a simple affidavit to the contrary, the scheme of deadlines and bar dates under the Bankruptcy Code would become unraveled."

*Id.* (citation omitted).

Without explicitly saying so, the lower court cases in the Sixth Circuit that interpret the *Yoder* rebuttal standard narrowly seem to require that a party's denial of receipt of the mailed item *must be credible*, based on all of the evidence presented, in order to rebut the presumption of receipt arising under the mailbox rule. *See generally Citizens Ins. Co. v. Harris*, 2016 WL 3743133, at *3-4; *Hoback*, 200 B.R. at 31; *Miller v. Certified Constr. Co. of Kentucky, LLC (In re Smith Mining & Mat., LLC)*, 399 B.R. 199, 202 (Bankr. W.D. Ky. 2008); *Guinn v. Irwin Mortg. Corp. (In re Patterson)*, 330 B.R. 631, 638-39 (Bankr. E.D. Tenn. 2005).

Arguably, this view of *Yoder* has some support in *Yoder* itself, where the Sixth Circuit cited "the general proposition that a presumption is rebutted 'upon the introduction of evidence which would support a finding of the nonexistence of the presumed fact.'" *Yoder*, 758 F.2d at 1118 (citing 10 Moore's Federal Practice § 301.04[2] (2d ed.)). Arguably, evidence that is not credible does not "support a finding of the nonexistence of the presumed fact." For example, the Sixth Circuit has held, in the context of summary judgment motions, that "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to reasonably support a verdict in such a plaintiff's favor. *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149-50 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

But the Court concludes that it cannot take this narrow view of *Yoder*. Rather, the Court is constrained to follow the broader, plain meaning of the following words the Sixth Circuit used

in *Yoder*:

> Testimony of non-receipt, standing alone, would be sufficient to support a finding of non-receipt; such testimony is therefore sufficient to rebut the presumption of receipt.

*Yoder*, 758 F.2d at 1118.

In this case the Defendants all testified, in one way or another, albeit with some inconsistencies, that they did not receive the Summons and Complaint that the Trustee mailed to them. As discussed below, the Court finds that this testimony is not credible, and the Court does not believe it. But under *Yoder*, even such non-credible testimony of non-receipt is sufficient to rebut the presumption of receipt under the mailbox rule.

The effect of the Defendants' rebuttal of the presumption of receipt is that the presumption drops out of the case, and the Court may not consider "the *presumption* as evidence of receipt." *See Yoder*, 758 F.2d at 1120 (italics added). So in this case the presumption under the mailbox rule is neutralized, and the Trustee obtains no benefit from it.

But this does not mean that the Court cannot consider the Trustee's evidence of mailing the Summons and Complaint to each of the Defendants. As noted above, it is logical that the Court may draw an inference, from the fact of the mailings, that the Defendants each actually received the Summons and Complaint in the mail.[163] And the Court may consider that logical inference, as part of considering all the relevant evidence bearing on the issue of receipt.

---

[163] In a lengthy footnote in *Yoder*, the Sixth Circuit reasoned that the presumption of receipt under the mailbox rule is a "logical" presumption, rather than an "illogical" one. By "logical," the court meant that "the facts giving rise to the presumption" (in this case the facts regarding the mailing of the item) "logically give rise to an inference that the presumed fact exists" (*i.e.*, an inference that the mailed item was received). *See Yoder*, 758 F.2d at 1120 n.13. The *Yoder* court also seemed to imply that where a "logical" presumption, such as this one, has been rebutted, the fact finder may not rely on any presumption, but it may consider the logical inference based on the basic facts. *See id.*

68

As noted above, each of the Defendants denied receiving the Summons and Complaint that the Trustee's counsel mailed to them. They first did this by signing identically-worded affidavits dated August 8, 2021, which the Defendants filed with their Rule 60(b) Motion on August 11, 2021. Each affidavit stated, in relevant part:

> 3. I did not receive the Complaint in the mail.
>
> 4. I only became aware of the Complaint when my attorney told me about it recently.[164]

The Defendants alleged more than this in their Rule 60(b) Motion; there they stated that "[t]he Defendants were not aware of the complaint or the default judgment until they met with their attorney on July 27, 2021."[165]

As described in Parts III.B and III.C of this Opinion, on three separate dates, three separate mailings were made to each of the Defendants at their home address. And in the combination of their Motion, their affidavits, and their testimony, the Defendants each have denied receiving *any* of these mailings. The mailings are (1) the Summons and Complaint mailed to each of the Defendants by the Trustee's counsel on January 25, 2021; (2) a copy of the Default Judgment that was mailed to each of the Defendants by the Clerk of this Court on February 26, 2021 (which mail was never returned to the Clerk's office as undeliverable or otherwise); and (3) the March 10, 2021 Letter from the Trustee's attorney, which was mailed to each of the Defendants and the Debtor on March 10, 2021.

In addition to their sworn statements in their August 8, 2021 affidavits, and the unsworn

---

[164] PX-1 (Defendants' three affidavits, each at ¶¶ 3, 4); Rule 60(b) Mot. (Docket # 13) at pdf pp. 10-14).

[165] Rule 60(b) Mot. (Docket # 13) at ¶ 41.

statement in ¶ 41 of their Rule 60(b) Motion, quoted above, the three Defendants testified that they did not receive any of the above three mailings, or in Camron's case, that she did not recall ever receiving any of the three mailings.[166]  And the Debtor testified that he did not receive the March 10, 2021 Letter in the mail either (that letter was addressed to the Debtor as well as each of the Defendants).

For example, Camile testified that she did not receive any of the three mailings in the mail.[167]  In addition, Camile testified that she did not receive a copy of the Trustee's Sale Motion in the mail,[168] even though the Trustee's attorney mailed a copy of that motion to Camile by first class mail on April 12, 2021.[169]

Camron testified during the evidentiary hearing that she did not receive the Summons, or the Complaint, or the Default Judgment in the mail, and learned of these things only when she met with her attorney, in July 2021.[170]  When asked if she received the March 10, 2021 Letter, Camron testified "I do not recall."[171]  (But Camron's testimony was inconsistent, and her deposition testimony about these things was quite different, as discussed below).

---

[166]  This complete denial of receipt by all of the Defendants is necessarily implied in the unsworn allegations the Defendants made in ¶ 41 of their Rule 60(b) Motion, quoted above.  That is, the Defendants could not possibly have been unaware of the Trustee's Complaint or the Default Judgment until they met with their attorney on July 27, 2021, *if* they had earlier received the Complaint, or the Default Judgment, or the Trustee's March 10, 2021 Letter.

[167]  Tr. 39 (testimony of Camile).

[168]  *Id.*; PX-35 at 51-52, 53-54 (Dep. of Camile) (testifying four times that she did not receive the Sale Motion in the mail); *but see id.* at 52, 54 ll. 2-3 (Dep. of Camile) ("I don't recall.").

[169]  *See* Part III.E of this Opinion.

[170]  *See* Tr. 133, 135, 144-45, 149 (testimony of Camron).

[171]  *Id.* at 145.

Gregory testified that he did not receive either the Summons or the Complaint in the mail, and never saw the Complaint until he met with his attorney in July 2021.[172]

The Debtor testified that he did not receive the Trustee's March 10, 2021 Letter in the mail, even though it was addressed to him also and was mailed to him by the Trustee's attorney.[173]  Rather, he testified, he only received that letter from the Trustee's counsel by email.[174]

That makes a total of *11 different mailings*, made over four different dates during the period January through April 2021, which the Defendants and the Debtor denied ever receiving in the mail.  The Court finds that this story and such testimony is not credible, and the Court does not believe it, for the following reasons.

**First**, the Court finds it highly unlikely that the post office would fail to deliver so many pieces of mail, sent at four different times, to the Defendants' home.  And the implausibility of this causes the Court to disbelieve the Defendants' denials that any of them received the Summons and Complaint in the mail.

**Second**, for the same many reasons why the Court finds the Defendants' story and testimony about the alleged 2019 Quit Claim Deed to be false, discussed in Part V.A.1.a of this Opinion, the Court finds the Defendants' story and testimony about non-receipt of the Summons and Complaint to be false.  In testifying about these matters, the Defendants, and the Debtor as

---

[172]  *Id.* at 157, 159 (testimony of Gregory).

[173]  Tr. 197-98 (testimony of Edward Williams).  The Summons and Complaint were not mailed to the Debtor, because he was not named a defendant.  But the Debtor testified that the Trustee's attorney emailed a copy of the Complaint to him, somewhere in the "springtime of 2021."  (Tr. 185-86) (testimony of Edward Williams).

[174]  *Id.* at 197-98.

well, all lack credibility.

**Third**, the Defendants' testimony of non-receipt of these mailed items was contradicted by certain testimony of the Debtor and of Camron. As noted in Part V.A.1.a of this Opinion, above, the Debtor testified that two of the Defendants, Camile and Gregory, received the February 26, 2021 Default Judgment that the Clerk's office mailed to them, and that they then asked the Debtor about it, after which the Debtor called the Trustee's attorney about the Property.[175] All of this happened sometime before the Debtor fired his bankruptcy attorney on March 23, 2021.[176] In his deposition, the Debtor testified about this as follows:

> Q. [By Mr. Majoros]: I'm now handing you what's been marked Deposition Exhibit No. 6. This was the [D]efault [J]udgment against all [the D]efendants in the adversary proceeding, Camile, Gregory and Camron.
>
> A. [By the Debtor]: Right.
>
> Q. This was served by the federal bankruptcy court to all three children at the [address of the P]roperty.
>
> A. Right.
>
> Q. **When they received this, did they say anything to you about it?**
>
> A. **They asked me what was going on.** The youngest girl didn't receive this. Just the old – Camron is the youngest girl. She didn't even receive it. **The other two children got it,** and I said I don't' know, let me find out. That's when I called you. That's when you told me in order for you and I to talk, I had to fire Sheena Majors. I fired her, emailed you that letter that I

---

[175] PX-36 at 48-49 (Dep. of Edward Williams).

[176] *See id.* The Debtor's testimony was that he fired his bankruptcy attorney after first contacting the Trustee's attorney. March 23, 2021 was the date on which the Debtor sent an e-mail terminating his bankruptcy attorney. *See* PX-5.

sent to her, and that's when you and I started communicating.

Q. All right. So you said Camron didn't get it?

A. No.

Q. Did not get the February 26, 2021 [D]efault [J]udgment, **but the other two did.**

A. **Correct. One of the other. I'm not sure. But I know one of the children didn't get it.**[177]

This testimony by the Debtor directly contradicts the testimony by at least two of the Defendants, most likely Camile and Gregory, that they never received the Default Judgment in the mail, and did not know about it until they talked with their attorney in July 2021. And this testimony by the Debtor directly contradicts the Defendants' statement, made in ¶ 41 of their Rule 60(b) Motion, that "[t]he Defendants were not aware of the complaint **or the default judgment** until they met with their attorney on July 27, 2021."[178]

The Debtor also testified that Camile received and knew about the Complaint, the Default Judgment, and the March 10, 2021 Letter, all before Camile entered into the April 10, 2021 Purchase Agreement with the Trustee:

Q. So it was after receipt of this [March 10, 2021] letter that Camile decided she wanted to purchase the house, correct?

A. Well, we didn't want to lose the house by any means necessary.
. . . .

---

[177] PX-36 at 48-49 (Dep. of Edward Williams) (emphasis added). Later, during his testimony in the evidentiary hearing, the Debtor said that he "must have made a mistake" in the testimony quoted above during his deposition. *See* Tr. 196 (testimony of Edward Williams). But the Court finds that this effort by the Debtor to retract his deposition testimony is not credible; the Court finds that the Debtor did *not* make a mistake in this deposition testimony.

[178] Rule 60(b) Mot. at ¶ 41 (emphasis added).

73

Q. So she knew about the trustee's complaint, she knew about the default judgment, she knew about the letter, and that's when she made a decision to buy the property from the bankruptcy estate, correct?

A. Well, after we talked about it, we decided that that might be a good way to go, yes.[179]

This testimony by the Debtor directly contradicts the testimony by Camile, in the evidentiary hearing and in her affidavit, that she never received the Complaint or the Default Judgment, and did not know about them, until she talked with the Defendants' attorney in July 2021. And this testimony by the Debtor directly contradicts the Defendants' statement, made in ¶ 41 of their Rule 60(b) Motion, that none of them were "aware of the complaint or the default judgment until they met with their attorney on July 27, 2021."[180]

Additional testimony by the Debtor contradicts this statement in the Defendants' Rule 60(b) Motion. As described in Part V.A.1.a of this Opinion, above, the Debtor also testified that he told his children about the Trustee's complaint, "around the springtime" of 2021; and that at that time he "sat them down and told them what was going on."[181] And the Debtor testified that after talking only to Camile initially, "'when things started getting really serious, that's when I brought my other two children, Gregory and Camron, hey, you all come here, we need to talk. This is what's going on.'"[182]

Camron's testimony was contradictory. As noted above, in her August 8, 2021 Affidavit,

---

[179] Tr. 199 (testimony of Edward Williams).

[180] *See* Rule 60(b) Mot. at ¶ 41.

[181] Tr. 186-87 (testimony of Edward Williams).

[182] *Id.* at 195; *see also* PX-36 at 29 (Dep. of Edward Williams).

Camron swore that she did not receive the Complaint and was not aware of the Complaint until her attorney told her about it "recently," *i.e.*, in July 2021. But later, in her deposition and during the evidentiary hearing, Camron's testimony changed. Essentially, Camron's testimony about her receipt of the Summons and Complaint changed, from "did not receive them" in her affidavit, to "not sure/don't remember" in her October 19, 2021 deposition, and then to "it's possible" in her evidentiary hearing testimony. The details of this are as follows.

In her deposition, Camron was asked if she received a copy of the Summons and Complaint "in the mail at" the Property, and she answered this way:

> A. I'm not sure.
>
> Q. You're not sure?
>
> A. No.[183]

Then Camron was asked if she received a copy of the Default Judgment in the mail from the bankruptcy court, and she answered this way:

> A. I really don't remember.
>
> Q. You don't remember?
>
> A. No.[184]

Then Camron was asked if she received a copy of the Trustee's March 10, 2021 Letter in the mail, and she answered this way:

> A. I really don't remember receiving this.
> . . . .

---

[183] PX-37 at 9 (Dep. of Camron).

[184] *Id.* at 10.

Q. . . . so you're not sure about whether or not you received this in the mail or not?

A.  Not this, no.

Q.  No, you're not sure?

A.  No.  I'm unsure I received this in the mail.
. . .

Q. . . . in March of 2021, do you recall any discussion with your father or siblings about this letter?

A.  I'm not sure.

Q.  You're not sure?

A. Not sure.[185]

Then in the evidentiary hearing, after being reminded of her deposition testimony,

Camron testified this way:

**Q.  So it's possible you did receive the complaint and the summons in mail, right?**

**A.  Yeah.**[186]

So Camron went from swearing in her August 8, 2021 affidavit that she did *not* receive

the Complaint, to swearing in her evidentiary hearing testimony that it is possible that she *did*

receive the Summons and Complaint in the mail.[187]

**Fourth**, while the Defendants and the Debtor testified that during the COVID pandemic

---

[185]  *Id.* at 10-11.

[186]  Tr. 149 (testimony of Camron) (emphasis added).

[187]  During the evidentiary hearing, Camron also testified that she is "not sure" whether she received a copy of the Default Judgment in the mail from the bankruptcy court.  Tr. 150 (testimony of Camron).

76

they had problems in getting mail at their home,[188] the Court finds that testimony unpersuasive and not credible.  And to the contrary, the Trustee presented evidence that the Court does find persuasive, that there were *not* problems with the delivery of mail to the Defendants' home during the time period January through March 2021.  One of the Trustee's exhibits, admitted into evidence without objection, was a declaration under penalty of perjury of the Acting Postmaster for the City of Detroit.[189]  The Postmaster declaration, dated October 8, 2021, states, in relevant part:

> 4. My responsibilities as Postmaster of Detroit include managing and overseeing all mail carrier services in Detroit including Carrier Route 2129, and specifically the address of Camile V. Williams, Gregory S. Williams and Cameron L. Williams at 18405 Prairie St., Detroit, Michigan (herinafter referred to as the "subject address").

> 5.  Based on a subpoena issued in bankruptcy proceeding 21-04032, I investigated the delivery of mail to the subject address from January 1, 2021 through March 31, 2021.  My review included conversations with several postal employees and searches of several Postal Service information systems.  Based on my review, I have reached the following conclusions:
> . . .

> b) **The Postal Service is not aware of any abnormalities or irregularities related to the delivery of mail to subject address from January 1, 2021 through March 31, 2021**;

> c) The Postal Service did not receive any change of address requests for the subject address from January 1, 2021 through March 31, 2021;

> d) The Postal Service did not receive any special instructions for

---

[188] *See* Tr. 7-8 (testimony of Camile); Tr. 134 (testimony of Camron); Tr. 157-58 (testimony of Gregory).

[189] PX-29.

the delivery of mail to subject address January 1, 2021 through March 31, 2021.[190]

This evidence, indicating that there were no "abnormalities or irregularities" in the mail delivery to the Defendants' home during the time period at issue, rebuts the Defendants' general and unpersuasive testimony about having some problems with the mail during the pandemic. And this evidence further shows the extreme unlikeliness of the Defendants' story, that *none* of a total of 11 different mailings to the Defendants, sent over four different dates during the period January through April 2021, were ever delivered to the Defendants' home.

**Fifth**, and as discussed in detail in Part V.A.1.a of this Opinion, above, all of the Defendants and the Debtor have a very strong motive to testify falsely, not only about the alleged 2019 Quit Claim Deed but also about whether the Defendants received the Summons and Complaint that were mailed to their home.

### d. Conclusion regarding Rules 60(b)(4) and 60(b)(6)

Based on the evidence and reasons described above, the Court finds that each of the Defendants did actually receive in the mail the Summons and Complaint, shortly after those things were mailed by the Trustee's attorney on January 25, 2021. As a result, the Court must reject the Defendants' request under Rules 60(b)(4) and 60(b)(6) for relief from the Default Judgment.

### 3. Defendants have not shown any basis for relief under the Rule 60(b)(1) "excusable neglect" provision.

With the possible exception of their assertion that they did not receive the Summons and

---

[190] *Id.* at 1-2 (emphasis added). The Court notes that the Trustee filed this declaration on October 21, 2021 (Docket # 36), so the Defendants and their attorney were aware of it more than three months before the Court held the evidentiary hearing.

Complaint, the Defendants have not made an argument for relief from the Default Judgment based on the "excusable neglect" ground in Civil Rule 60(b)(1). In any event, the Defendants are not entitled to any relief for excusable neglect.

In order for the Defendants to show that relief is appropriate under Rule 60(b)(1) based on "excusable neglect," they must show both (1) that their conduct in failing to timely answer the Complaint constituted "neglect" within the meaning of Rule 60(b)(1); and (2) that their "neglect" was "excusable." *See Conopco, Inc. v. Sadeghi-A* (*In re Sadeghi-A*), 597 B.R. 403, 406 (Bankr. E.D. Mich. 2019) (citing *In re Sharkey*, 560 B.R. 470, 472 (Bankr. E.D. Mich. 2016)). And the Defendants must meet the other requirements for relief under Rule 60(b)(1), described in Part V.A of this Opinion, including the requirement of showing that they have a "meritorious defense" to the Trustee's claims.

This Court has previously discussed the requirements that the Defendants show "neglect" that is "excusable," as follows:

> "The determination of excusable neglect is 'an equitable one, taking account of all relevant circumstances surrounding the party's omission.'" *Pioneer Inv. Servs. Co. v. Brunswick Assocs. P'ship*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)[;] *Howard v. Nationwide Prop. & Cas. Ins. Co.*, 306 F. App'x 265, 266 (6th Cir. 2009). As this Court stated in *Sharkey*,

>> In *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the [United States] Supreme Court explained that "[t]he ordinary meaning of 'neglect' is 'to give little attention or respect' to a matter, or . . . 'to leave undone or unattended to esp[ecially] through carelessness.'" *Id*. (quoting Webster's Ninth New Collegiate Dictionary 791 (1983) (emphasis added) ). Based on the ordinary meaning of "neglect," the Court concluded that the concept of

79

"neglect" under Civil Rule 60(b)(1) denotes that "a party is partly to blame" for failing to act, and that "at least for purposes of Rule 60(b), 'excusable neglect' is understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence." *Id.* at 394, 113 S.Ct. 1489 (internal quotation marks and citations omitted).

If [the party seeking relief from an order based on "excusable neglect"] shows "neglect," the next issue is whether [that party's] neglect was excusable. In *Pioneer*, the Supreme Court explained that **a determination of**

> **whether a party's neglect of a deadline is excusable is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission [including] the danger of prejudice to the [party opposing relief], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.**

*Id*. at 395, 113 S.Ct. 1489.

*Sharkey*, 560 B.R. at 472–73 (emphasis added).

*Sadeghi-A*, 597 B.R. at 406 (emphasis added).

In this case, the Court cannot find that there was "neglect" on the Defendants' part, rather than an intentional failure, in missing the deadline for answering the Complaint. The Defendants did not present any evidence of "neglect" on their part, rather than an intentional decision not to respond to the Trustee's Complaint. It may well be that after they received the Summons and

80

Complaint in the mail, as the Court has found they did, the Defendants intentionally decided not to respond because at that time, they did not think they had any defense to the Trustee's claims. But even if there was such "neglect," the Court finds that all of the *Pioneer* factors weigh against the Court finding that the Defendants' neglect was "excusable."

The Defendants argue that they were not at fault for missing the deadline to answer the Complaint, only because, they say, they did not receive a copy of the Summons or Complaint in the mail. But the Court has found otherwise, and found that each of the Defendants was properly served with the Summons and Complaint, and did timely receive them in the mail. Therefore, the Defendants have failed to prove any possible valid excuse for any neglect on their part.

Because the Defendants have failed to prove excusable neglect in their failure to timely respond to the Complaint, the Court need not consider the other two factors identified by the Sixth Circuit in *Waifersong*. But even if the Court were to do so, one of those factors would prevent relief under Rule 60(b)(1)'s excusable neglect provision. For the reasons stated in Part V.A.1.a of this Opinion, the Defendants have no meritorious defense to the Trustee's Complaint. That alone would preclude relief for any alleged "excusable neglect" under Rule 60(b)(1). *See Sharkey*, 560 B.R. at 472 (quoting *Waifersong, Lt. Inc. v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir. 1992)).

## B. Defendants' Stay-Relief Motion

In the Stay-Relief Motion, the Defendants seek entry of an order lifting the automatic stay so that the Defendants can open a probate estate for Celia Williams and have the probate court determine whether the Property is part of the Celia Williams probate estate. The Stay-Relief Motion also seeks entry of an order staying this adversary proceeding until the probate court has

made a determination regarding the ownership of the Property after Celia Williams's death. The Stay-Relief Motion states, in relevant part:

> 10. There is cause to terminate the automatic stay because the issue as to whether the Property is property of Celia Williams' probate estate (and thus would be inherited by the Debtor) MUST be decided by a state probate court.
>
> . . . .
>
> 13. Pursuant to MCL 700.1302(a)(iii), a proceeding to establish a decedent estate's right to property falls within the probate court's exclusive jurisdiction to make a declaration of rights that involve an estate. *See Provizer v. Jackson*, No. 298797 (Mich Ct App Mar 29, 2012) (unpublished).
>
> 14. The probate exception divests this Court of jurisdiction to rule on this matter because the issue of whether the Debtor inherited the Property is within the exclusive jurisdiction of the state probate court.
>
> 15. The fact that the Chapter 7 Trustee, in his complaint, asks this Court to exercise *in rem* jurisdiction over the Property also triggers the probate exception.
>
> 16. The adversary proceeding should be held in abeyance until the state probate court makes a determination as to the status of the Property.
>
> 17. The Default Judgment Against All Defendants, entered on February 26, 2021, should be vacated pursuant to FRCP 60(b)(4) because this Court did not have jurisdiction to rule on whether the Debtor inherited the Property.[191]

The Court has rejected the Defendants' arguments in the Stay-Relief Motion. For the reasons discussed in Part IV.B of this Opinion, this Court had subject matter jurisdiction to enter the Default Judgment, and the probate exception does not apply. As described in this Opinion, the Default Judgment has determined that the Property is property of the bankruptcy estate,

---

[191] Stay-Relief Mot. (Docket # 54) at 1-2.

because the Debtor owned the Property when he filed his bankruptcy petition. That is a final judgment that is binding on the Defendants, and the Court will not vacate or modify that final judgment. In this Opinion, this Court has determined, after holding an evidentiary hearing, that the Defendants' mother did *not* transfer the Property to the Defendants prior to her death, as the Defendants allege, and that the Property was owned by the Debtor at the time he filed his bankruptcy petition. As a result, the Property is property of the bankruptcy estate.

Because the Property is property of the bankruptcy estate, this Court has exclusive jurisdiction over the Property. Under 28 U.S.C. § 1334(e)(1), "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction– (1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate."

For these reasons, there is no cause to lift the automatic stay, and there is no valid reason to stay this adversary proceeding. For these reasons, the Court must deny the Stay-Relief Motion.

## VI. Conclusion

For the reasons stated in this Opinion, the Court will enter an order denying the Defendants' Rule 60(b) Motion and denying the Defendants' Stay-Relief Motion.[192] In addition, and for the reasons stated in footnote 159 of this Opinion, the Court's order will declare that the "Affidavit of Deed" recorded by the Debtor on June 15, 2021 is void, as a violation of the

---

[192] Given the Court's findings and conclusions in this Opinion, it is not necessary for the Court to address some of the alternative arguments the Trustee made for denying Rule 60(b) relief. The Court expresses no opinion regarding those other arguments, such as the Trustee's argument that the Defendants failed to make their Rule 60(b) Motion "within a reasonable time" as required by Fed. R. Civ. P. 60(c)(1).

automatic stay.

Signed on February 22, 2023



/s/ Thomas J. Tucker
Thomas J. Tucker
United States Bankruptcy Judge